721 A.2d 1040

COMMONWEALTH of Pennsylvania, Appellee,

v.

Kevin CHANDLER, Appellant.

Supreme Court of Pennsylvania.

Resubmitted March 16, 1998.

Decided Nov. 23, 1998.

402

Jeremy H.G. Ibrahim, Philadelphia, for K. Chandler.

Catherine Marshall, Thomas W. Dolgenos, Philadelphia, for Com.

Robert A. Graci, Harrisburg, for Com., Office of Atty. Gen.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN and SAYLOR, JJ.

## OPINION

NIGRO, Justice.

On May 4, 1995, following a jury trial, Appellant Kevin Chandler was found guilty of one count of possessing an instrument of crime [1] and two counts of first-degree murder [2] for the killing of his wife, Nicole, and her younger sister, Isis Burbage. After a penalty hearing, the jury found that one aggravating circumstance [3] outweighed three mitigating circumstances [4], and returned a verdict of death on both murder counts. On May 5, 1995, the trial court formally imposed the death sentence. [5] This direct appeal followed. For the reasons presented herein, we affirm Appellant's convictions but reverse the judgment of sentence.

1. *See* 18 Pa.C.S. § 907 (Supp.1997).

2. *See* 18 Pa.C.S. § 2502(a) (1983).

3. *See* 42 Pa.C.S. § 9711(d)(11) (Supp.1997) ("The defendant has been convicted of another murder committed in any jurisdiction and committed either before or at the time of the offense at issue.").

4. *See id.* § 9711(e)(1) (1982) ("The defendant has no significant history of prior criminal convictions."); § 9711(e)(3) (1982) ("The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired."); § 9711(e)(8) (1982) ("Any other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense.").

5. Appellant was also sentenced to two and a half to five years in prison on the possessing an instrument of crime charge. On appeal, he does not challenge his conviction and sentencing on that charge.

Initially, Appellant argues that the evidence was insufficient to sustain the two verdicts of first-degree murder. He claims that the Commonwealth failed to establish beyond a reasonable doubt that he possessed the specific intent to kill his wife and her sister. This claim is meritless.

In reviewing the sufficiency of the evidence, we examine the evidence, and all reasonable inferences drawn therefrom, in the light most favorable to the Commonwealth as verdict winner and determine whether the jury could find every element of the crime beyond a reasonable doubt. *See Commonwealth v. Michael,* 544 Pa. 105, 110–12, 674 A.2d 1044, 1047 (1996). To obtain a conviction for first-degree murder, the Commonwealth must prove that a human being was unlawfully killed; that the defendant did the killing; and that the killing was done intentionally. *See* 18 Pa.C.S. § 2502(a), (d) (1983); *Commonwealth v. Wilson,* 543 Pa. 429, 437–39, 672 A.2d 293, 297 (1996). Further, the specific intent to kill may be inferred from the defendant's use of a deadly weapon upon a vital part of the victim's body. *See Commonwealth v. Michael,* 544 Pa. 105, 110–12, 674 A.2d 1044, 1047 (1996); *Commonwealth v. Bond,* 539 Pa. 299, 305, 652 A.2d 308, 311 (1995).

The relevant facts are as follows. Appellant and Nicole were married in 1988. At the time Nicole was killed, the couple had two young sons. As early as 1989, Ernice Burbage, Nicole and Isis' mother, noticed that Nicole was showing signs of physical abuse by Appellant, including black eyes, swollen lips, and bruises on her arms and body. As time passed, Nicole's co-workers also noticed her bruises.

In August 1992, Nicole applied for an emergency protection from abuse order against Appellant. That order never became effective, however, because Nicole failed to fulfill all its requirements.

The fighting and abuse continued into 1993. In June of that year, Nicole filed for a second protection from abuse order, this time satisfying all its requirements. After Appellant failed to appear at the scheduled hearing, a protection from

abuse order, effective for one year, was issued against him on June 16, 1993. As a result, he left the house he shared with Nicole and the children and moved in with his father, who lived two houses away.

At 4:30 a.m. on July 14, 1993, Appellant broke a window at Nicole's residence. At 6:00 a.m., he returned and entered the home. He and Nicole began arguing in the living room. Isis, who was staying with Nicole to help care for the children, entered the room. Appellant ordered them to sit on the couch, then on the floor. When Nicole attempted to stand, Appellant attacked both women with a butcher knife. He stabbed Nicole six times; Isis was stabbed twenty-six times. Appellant's seven year old stepson, Kevin Chandler, Jr., witnessed the entire episode.

After the attack, Appellant dropped the knife and ran back to his father's house, where he called 911 and reported the murders. He then swallowed an entire bottle of antihistamine pills in an attempt to commit suicide.

When police reached the scene, Isis Burbage was dead. Nicole died upon arrival at the hospital. As the police were gathering evidence, Appellant returned. He attempted to embrace one of the officers and verbally confessed to the murders.

He was taken to the hospital where the antihistamines were removed from his system. Later that day, he waived his *Miranda* rights and gave a formal statement confessing to the murders.

██ We find this evidence more than sufficient to establish that Appellant stabbed Nicole Chandler and Isis Burbage and did so with the specific intent to kill. *See Michael,* 544 Pa. at 110–12, 674 A.2d at 1047; *Bond,* 539 Pa. at 305, 652 A.2d at 311. Thus, the jury could have found each element of an intentional killing beyond a reasonable doubt. *See* 18 Pa.C.S. § 2502(a), (d) (1983); *Wilson,* 543 Pa. at 437–39, 672 A.2d at 297.

Appellant next argues that his trial was barred under principles of double jeopardy. Initially, Appellant went to trial on March 22, 1994 but a mistrial was declared six days later due to prosecutorial misconduct. During his first trial, Appellant took the stand. On cross-examination, the prosecutor asked Appellant a series of three questions.[6] A mistrial was granted because those questions were not based on evidence of record. *See* N.T., 5/29/94 at 126–27. Appellant now argues that the prosecutor's misconduct in his first trial prohibited his second trial by virtue of double jeopardy principles.

In *Commonwealth v. Smith*, 532 Pa. 177, 615 A.2d 321 (1992), this Court held

> that the double jeopardy clause of the Pennsylvania Constitution prohibits retrial of a defendant not only when prosecutorial misconduct is intended to provoke the defendant into moving for a mistrial, but also when the conduct of the prosecutor is intentionally undertaken to prejudice the defendant to the point of the denial of a fair trial.

*Smith*, 532 Pa. at 186, 615 A.2d at 325. Appellant claims that the misconduct in his first trial falls within the ambit of *Smith*. He suggests that the prosecutor's actions were intended to provoke him to move for a mistrial, thereby triggering double jeopardy concerns.

We disagree. By the time Appellant took the stand, his confession had been introduced, his stepson had testified that he witnessed Appellant kill Nicole and Isis, and the jury had

---

**6.** The three questions at issue were as follows:
[PROSECUTOR]: Mr. Chandler, did you follow your wife down to Virginia?
[APPELLANT]: No.

\* \* \*

[PROSECUTOR]: Didn't you in fact tell your wife that you would kill Mary Abney if Nicole—if Mary Abney let Nicole stay with her?
[APPELLANT]: No.

\* \* \*

[PROSECUTOR]: Did you ever threaten to kill Nicky's mother … if Nicky went to stay with her?
[APPELLANT]: No.
N.T., 5/29/94 at 99–100.

heard the testimony concerning Appellant's ongoing abuse of his wife. Given this overwhelming evidence of Appellant's guilt, we believe any attempt by the prosecution to provoke a mistrial would simply have been nonsensical. Moreover, having reviewed the record, we find nothing to substantiate Appellant's claim that the prosecution was in fact attempting to do so. The three questions that led to the mistrial, while not proper, do not of themselves indicate any such intention on the part of the prosecution. Accordingly, double jeopardy principles did not bar Appellant's retrial.

 Appellant next argues that the trial court abused its discretion by admitting evidence of Appellant's prior abuse of Nicole. We disagree.

> [E]vidence concerning the previous relations between a defendant and a homicide victim is relevant and admissible for the purpose of proving ill will, motive or malice.... This principle applies when the decedent was the spouse of the accused. Thus, evidence concerning the nature of the marital relationship is admissible for the purpose of proving ill will, motive or malice. This includes, in particular, evidence that the accused physically abused his or her spouse.

*Commonwealth v. Ulatoski*, 472 Pa. 53, 60–61, 371 A.2d 186, 190 (1977) (footnotes omitted); *see also Commonwealth v. Smith*, 544 Pa. 219, 236, 675 A.2d 1221, 1229 (1996), *cert. denied*, 519 U.S. 1153, 117 S.Ct. 1090, 137 L.Ed.2d 223 (1997); *Commonwealth v. Albrecht*, 510 Pa. 603, 618, 511 A.2d 764, 772 (1986), *cert. denied*, 480 U.S. 951, 107 S.Ct. 1617, 94 L.Ed.2d 801 (1987). Evidence of prior abuse is also admissible if it is " 'part of a chain or sequence of events which formed the history of the case and was part of its natural development.' " *Commonwealth v. Walker*, 540 Pa. 80, 98, 656 A.2d 90, 99 (quoting *Commonwealth v. Sam*, 535 Pa. 350, 359, 635 A.2d 603, 607 (1993)), *cert. denied*, 516 U.S. 854, 116 S.Ct. 156, 133 L.Ed.2d 100 (1995).

At trial, Nicole's mother and her two brothers, Anthony and Clarence, testified concerning a number of instances through-

out 1992 and 1993 where Nicole would appear with black eyes, swollen or split lips, bite marks, and bruises to her arms and body, often after having an argument with Appellant. *See* N.T. 5/1/95 at 152–88, 5/2/95 at 23–39, 79–90, 103–25. Further, two of Nicole's co-workers testified concerning the physical signs of abuse Nicole exhibited. *See* N.T. 5/2/95 at 55–67, 73–77.

This testimony was clearly admissible under *Ulatoski* and *Walker*. Evidence of Appellant's repeated abuse of Nicole was properly admitted not only to establish motive and malice, but also to show the development of the case and the history of events leading up to the murder.[7]

Appellant, however, claims that this testimony should not have been allowed because it constituted inadmissible hearsay. This claim also fails.

The statements made by Nicole's mother, two brothers, and two co-workers on direct examination take up more than one-hundred pages of the notes of testimony. Despite this, Appellant fails to identify any specific statement as hearsay and fails to explain how this alleged hearsay denied him a fair trial. He simply claims that "much of the testimony was hearsay evidence relating to statements that the decedent, Nicole Chandler, made to co-workers and family members." Appellant's Br. at 16. Appellant's complete failure to elaborate on this assertion renders his claim waived. *See Commonwealth v. LaCava*, 542 Pa. 160, 188, 666 A.2d 221, 235 (1995) (where appellant cited to 21 pages of cross-examination to prove prosecutorial misconduct, but failed to identify which statements were improper and why, claim was waived; "This Court will not make appellant's arguments for him.") (citing *Commonwealth v. Jackson*, 494 Pa. 457, 459, 431 A.2d 944, 945

7. Appellant suggests that the evidence of his abuse of Nicole was inadmissible because none of the abuse resulted in his arrest or the filing of criminal charges against him. This claim is meritless. If competent, evidence of prior abusive conduct, whether charged or uncharged, constitutes relevant and admissible evidence under *Ulatoski* and *Walker*. *See also Albrecht*, 510 Pa. at 618, 511 A.2d at 772; *Sam*, 535 Pa. at 359, 635 A.2d at 607.

(1981)); *Commonwealth v. Ragan*, 538 Pa. 2, 37–38, 645 A.2d 811, 828–29 (1994). However, pursuant to this Court's practice to relax waiver rules in capital cases, and for the sake of judicial economy, we have nonetheless reviewed Appellant's claim on the merits. *See Commonwealth v. Zettlemoyer*, 500 Pa. 16, 50 n. 19, 454 A.2d 937, 955 n. 19 (1982) (practice of this Court is to relax waiver rules in death penalty cases and address claim on merits if possible to do so from the record).

An examination of the record indicates that the trial court did not abuse its discretion in admitting the challenged testimony. The court sustained a number of defense counsel's objections during the testimony of Ernice Burbage, *see* N.T., 5/1/95 at 152–188, 5/2/95 at 23–39; Anthony Burbage, *see* N.T., 5/2/95 at 79–90; Clarence Burbage, *see* N.T., 5/2/95 at 103–25; and one of Nicole's co-workers, *see* N.T., 5/2/95 at 55–67. By doing so, the court limited the testimony to the eyewitness observations of Nicole's family and co-workers, which were not hearsay, and to statements Nicole made concerning her negative feelings about Appellant and her relationship with him. Those statements were admissible under the "state of mind" exception to the hearsay rule because Nicole's opinion of Appellant and her marriage to him went to the presence of ill will, malice, or motive for the killing. *See e.g., Commonwealth v. Ragan*, 538 Pa. 2, 17, 645 A.2d 811, 818–19 (1994); *Commonwealth v. Sneeringer*, 447 Pa.Super. 241, 250–51, 668 A.2d 1167, 1171–72 (1995) (murder victim's statements concerning the breakdown of her relationship with defendant relevant as to motive and admissible under the "state of mind" hearsay exception), *appeal denied,* 545 Pa. 651, 680 A.2d 1161 (1996). Accordingly, we find Appellant's claim to be meritless.

In a related claim, Appellant suggests that he was denied a fair trial because Nicole's family members and her co-workers "intentionally made statements intertwined with their testimony which were designed to unduly prejudice the jury against" him. Appellant's Br. at 18. He claims that these witnesses engaged in "general Appellant bashing." *Id.* at 19.

As with his hearsay issue above, this claim is waived. Appellant's entire argument on this point consists of four sentences, with no citation to legal authority of any kind. *See* Appellant's Br. at 18–19. He fails to identify even a single statement that was supposedly improper, let alone how any such statement deprived him of a fair trial. Absent even a minimal attempt at presenting an argument in support of his assertions, Appellant's claim is waived. *See LaCava*, 542 Pa. at 188, 666 A.2d at 235; *Ragan*, 538 Pa. at 37–38, 645 A.2d at 828–29; *Jackson*, 494 Pa. at 459, 431 A.2d at 945. Despite Appellant's undeveloped argument, in light of the relaxed waiver rule applicable in capital cases, *see Zettlemoyer*, 500 Pa. at 50 n. 19, 454 A.2d at 955 n. 19, we have nonetheless reviewed the testimony of Nicole's family and her co-workers to determine whether Appellant's claim has merit. While these individuals were understandably not sympathetic toward Appellant, we find nothing in their testimony to substantiate a claim of "general Appellant bashing." Thus, this claim offers Appellant no basis for relief.

Next, Appellant claims that the prosecutor engaged in misconduct when he paused in his direct examination of a witness to note a possible violation of the trial court's witness sequestration order.[8] Appellant claims that the prosecutor

---

**8.** Appellant complains of the following discussion:
[PROSECUTOR]: I just want to note, for the record, that some people have entered the courtroom. There is a sequestration order. I have no idea who they are. If they are expected to be called as witnesses for the Defense, I would ask that they be sequestered, and I would note for the record, that they have been sitting in the courtroom since we started this morning.
[DEFENSE COUNSEL]: If I can go check, please?
THE COURT: Sure.
(Whereupon, a brief pause was taken from the proceedings, at this time.)
THE COURT: Why don't you have them step out?
[PROSECUTOR]: Those who are leaving, I would ask that they be identified, because they are in violation of the sequestration order.
THE COURT: Will those people be witnesses?
[DEFENSE COUNSEL]: One of them, who is leaving now, who has been watching the trial, he is not a witness. Of the other people who have come in, some have indicated—one person just told me that he is not. Another person said that she is here to spectate, but until I've found out who's who—

"entered into a soliloquy designed to influence the jury's perception of defense witnesses ... in a negative way." Appellant's Br. at 19.

This claim is devoid of merit. A prosecutor's comments do not constitute reversible error unless their " 'unavoidable effect ... [was] to prejudice the jury, forming in their minds fixed bias and hostility toward the defendant so that they could not weigh the evidence objectively and render a true verdict.' " *Bond*, 539 Pa. at 314, 652 A.2d at 315 (quoting *Commonwealth v. D'Amato*, 514 Pa. 471, 490, 526 A.2d 300, 309 (1987)). After reviewing the statements Appellant complains of, we find no misconduct. The prosecutor merely objected to an apparent violation of the court's sequestration order, and did so in an inoffensive way. None of the statements in question could have had the unavoidable effect of negating the jury's objectivity. No relief is due.

In his final argument concerning the guilt phase, Appellant argues that the "cumulative effect of the error[s] in his trial" deprived him of a fair and impartial trial. Appellant's Br. at 21. Appellant does not identify any particular errors in connection with his claim. Instead, he seems to suggest that the claims he presents in his brief, taken together, demonstrate that he was denied a fair trial.

In *Commonwealth v. Murphy*, 540 Pa. 318, 657 A.2d 927 (1995), we rejected an identical argument, noting that such a claim " 'is mere makeweight, and a rather blatant attempt to bootstrap. We have found no ... [errors], and no number of failed claims may collectively attain merit if they could not do so individually.' " *Id.* at 336 n. 6, 657 A.2d at 936 n. 6

THE COURT: There is no substance, with regard to anything testified to by this witness, that they have heard—we haven't gotten into [defendant's] statement yet, or the substantive statement, so you may proceed. Just continue, please.

[PROSECUTOR]: Perhaps we can instruct the Court Officers to be aware of the comings and goings of people out of the courtroom. I can't keep my eye on the door and ask questions at the same time, and I do not want any further violations of the sequestration order. Thank you.

THE COURT: Fine.

N.T., 5/3/95 at 58–59.

(quoting *Commonwealth v. Williams,* 532 Pa. 265, [278,] 615 A.2d 716[, 722] (1992)).

*Commonwealth v. McGill,* 545 Pa. 180, ——, 680 A.2d 1131, 1136 (1996), *cert. denied,* 519 U.S. 1152, 117 S.Ct. 1087, 137 L.Ed.2d 221 (1997). In keeping with our previous decisions, we find Appellant's claim meritless. Having concluded that Appellant's claims of error in the guilt phase of his trial lack merit, we affirm Appellant's convictions.

Turning to his claims of error in the penalty phase, Appellant argues that he is entitled to a new sentencing hearing because the trial court erred by refusing his request for a *Simmons* [9] jury instruction explaining what a sentence of "life imprisonment" means in Pennsylvania. We agree.

■■■ Under the current state of the law, where future dangerousness is at issue and a specific request is made by a capital defendant, it is a denial of due process for the trial court to refuse to tell a jury what the term life sentence means. *Commonwealth v. Smith,* 544 Pa. 219, 242, 675 A.2d 1221, 1232 (1996), *cert. denied,* 519 U.S. 1153, 117 S.Ct. 1090, 137 L.Ed.2d 223 (1997); *Commonwealth v. Chambers,* 546 Pa. 370, 390, 685 A.2d 96, 106 (1996); *Commonwealth v. Christy,* 540 Pa. 192, 216, 656 A.2d 877, 889 (1995), *cert. denied,* 516 U.S. 872, 116 S.Ct. 194, 133 L.Ed.2d 130 (1995).

■■■ Here, during the penalty phase of Appellant's trial, the prosecutor made the following statements during his closing argument to the jury: "Frankly, ladies and gentlemen, life imprisonment in this case is simply not enough. I am asking you, with your verdict today, to stop Kevin Chandler, to stop him from ever hurting another woman again, to stop him from ever killing another woman again." N.T., 5/5/95, at 18. While the prosecutor did not actually use the words "future dangerousness," it is nonetheless clear that the prosecutor was urging the jury to consider Appellant's potential future danger to other women in fixing his penalty. The absence of a precise phrase simply cannot overcome the effect

**9.** *Simmons v. South Carolina,* 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994).

of the prosecutor's statements, which was to inject the issue of Appellant's future dangerousness into the jury's deliberations in the penalty phase of Appellant's trial. Once the issue of future dangerousness is raised, and the defendant requests a *Simmons* instruction, both of which occurred here, the trial court is required under *Christy* and its progeny to give the jury an instruction on what the term "life imprisonment" means in Pennsylvania. Accordingly, we find that the trial court committed reversible error in rejecting Appellant's request for a *Simmons* instruction.[10]

Since we find that future dangerousness was raised in the penalty phase of Appellant's trial, we vacate the sentence of death on the basis that a *Simmons* instruction was required under the current state of the law, and remand for a new sentencing hearing.

Justice NEWMAN filed a Dissenting Opinion in which Justice CASTILLE joins.

NEWMAN, Justice, dissenting.

The majority concludes that Appellant's future dangerousness was at issue in the penalty phase, and, therefore, Appellant was entitled to a *Simmons* instruction. Because I disagree with this conclusion, I dissent. In addition, I note that this Court should continue to decline to extend *Simmons* to cases in which future dangerousness is not an issue.

During the penalty phase, the prosecutor offered no testimony concerning Appellant's future dangerousness, and made only one passing remark in his argument that could in any

**10.** While we find that future dangerousness was in fact raised in the instant case, warranting a *Simmons* instruction under the current state of the law, I reiterate that the better approach would be to give a *Simmons* instruction in all capital cases regardless of whether the issue of a defendant's future dangerousness is raised by counsel. *See Commonwealth v. Clark*, 551 Pa. 258, 710 A.2d 31, 43–44 (1998) (Nigro, J. concurring). Such a standard instruction would allow every jury considering the death penalty to be informed, as thoroughly as possible, what the term "life imprisonment" actually means in Pennsylvania at the time of the instruction.

way be construed as a reference to future dangerousness.[1] I cannot agree that this single comment put the issue of future dangerousness before the jury to the extent that a *Simmons* instruction was necessary. *Cf. Simmons v. South Carolina,* 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (prosecutor presented expert testimony regarding future dangerousness and argued the issue extensively).

Furthermore, the majority should not have advocated the view expressed in the concurring opinions in *Commonwealth v. Clark,* 551 Pa. 258, 710 A.2d 31 (Pa.1998). In *Simmons,* the United States Supreme Court held that where the prosecution argued the future dangerousness of the accused, the trial court had to inform the jury that a life sentence in South Carolina meant life without the possibility of parole. A minority of this Court has expressed the view that, in all capital cases, trial judges in Pennsylvania should instruct capital sentencing juries that life imprisonment means life without parole, even where the Commonwealth has not made future dangerousness an issue. *See Commonwealth v. Robinson,* 721 A.2d 344 (Flaherty, C.J., dissenting; Zappala, J., concurring); *Clark, supra* (Zappala, J., concurring; Nigro, J., concurring); *Commonwealth v. May,* 551 Pa. 286, 710 A.2d 44 (1998) (Zappala, J., concurring; Nigro, J., concurring). This contingent of the Court is concerned that capital sentencing juries will unlawfully elect a death sentence if they erroneously believe that a defendant may be paroled at a future date. Therefore, the theory goes, by giving the "life means life" instruction, trial judges will better ensure that the jury's decision is a fully informed one.

In the first instance, the *Clark* concurrence is not the law of Pennsylvania, and an endorsement of it has no place in the majority's opinion here. Likewise, *Simmons* does not require Pennsylvania to adopt such a rule, which is one of policy and not of constitutional law. Finally, the premise on which the *Clark* concurrence is based is, at best, highly questionable.

---

1. The prosecutor asked the jury to impose the death penalty "to stop [Appellant] from ever hurting another woman again, to stop him from ever killing another woman again." N.T., 5/5/95, at 18.

In *Simmons,* prosecutors argued at trial that the defendant would be dangerous in the future. In addition, the trial court instructed the jury that the term "life imprisonment" should be understood in its plain and ordinary meaning, but that they could not consider the issue of parole. The United States Supreme Court reversed, holding that the instruction was confusing to the jury and did not satisfy due process. The defendant could only deny or explain the showing of future dangerousness if the jury was fully aware of his ineligibility for parole. Therefore, the Court concluded, the defendant was entitled to have this information placed before the jury as a matter of due process. Arguing future dangerousness while simultaneously preventing the jury from knowing that the defendant would never be released on parole, the Court concluded, created a "false dilemma." *Simmons,* 512 U.S. at 171, 114 S.Ct. at 2198.

Nothing in Simmons, however, requires, as a matter of constitutional law, a "life means life" instruction where a defendant's future dangerousness is *not* at issue. Indeed, where future dangerousness is not at issue, the "false dilemma" that the *Simmons* plurality feared is not created. If the prosecution has not argued that a defendant will be a threat to society in the future, then the question of whether the defendant will be eligible for parole is irrelevant. Moreover, in that instance, the defendant's due process right to rebut the prosecution's theory is not implicated. As Justice O'Connor stated in her opinion concurring in the judgment, joined by Chief Justice Rehnquist and Justice Kennedy, "if the prosecution does not argue future dangerousness, the State may appropriately decide that parole is not a proper issue for the jury's consideration even if the only alternative sentence to death is life imprisonment without the possibility of parole." *Id.* at 176–77, 114 S.Ct. at 2200 (O'Connor, J., concurring in the judgment).

Additionally, as Justice Scalia explains in his *Simmons* dissent, the idea that capital sentencing juries impose the death penalty because they fear the defendant's future dangerousness is "quite farfetched." *Simmons,* 512 U.S. at 184,

114 S.Ct. at 2204 (Scalia, J., dissenting). Instead, the imposition of the death penalty is more likely induced by the "sheer depravity of [the] crimes, rather than any specific fear for the future." *Id.* at 181, 114 S.Ct. at 2202 (Scalia, J., dissenting). This is particularly true where the prosecution does not argue future dangerousness. When the crimes for which a defendant is convicted are especially heinous, it is unlikely that information regarding parole ineligibility will alter the jury's decision to impose the death penalty.

Therefore, this Court's current position is consistent with *Simmons*, which requires no more than that a court disclose to the jury information about parole where the prosecution argues future dangerousness and where state law precludes the possibility of parole from a life sentence. In addition, this Court's current position is sound because it limits the questionable presumption that the decisions of capital juries are based on future dangerousness. Neither the federal nor the state constitution requires more, and any extension of *Simmons* is a policy decision best left to the legislature. *Cf.* N.C. GEN. STAT. § 15A–2002 (representing the North Carolina General Assembly's decision to require by statute a jury instruction that "life means life without parole"). This Court's position is, and should continue to be, that unless the prosecutor makes an issue of the defendant's future dangerousness, a "life means life" instruction is simply not warranted. *See, e.g., Commonwealth v. May*, 551 Pa. 286, 710 A.2d 44 (Pa.1998).

Nevertheless, in cases where *Simmons* would require a "life means life" instruction, I agree with Chief Justice Flaherty that the court should instruct the jury that the defendant's sentence could be commuted. Where future dangerousness is at issue, the impossibility of parole and the possibility of commutation are equally relevant, so the court should inform the jury of both contingencies. Here, however, I do not believe that future dangerousness was at issue. Thus, I would affirm the trial court's decision not to instruct the jury with respect to the possibility of parole or commutation.

Justice CASTILLE joins this dissenting opinion.