COMMONWEALTH of Pennsylvania, Appellee

v.

**John PASSMORE, Appellant.**

Superior Court of Pennsylvania.

Argued March 24, 2004.

Filed Aug. 30, 2004.

---

Kevin M. Leckerman, Doylestown, for appellant.

T. Gary Gambardella, Assistant District Attorney, Doylestown, for Commonwealth, appellee.

Before: STEVENS, MONTEMURO,* and KELLY, JJ.

OPINION BY KELLY, J.:

¶ 1 Appellant, John Passmore, asks us to determine whether the Court of Common Pleas of Bucks County had jurisdiction to convict him of second degree murder [1] following his guilty plea to murder generally. Specifically, Appellant claims there was insufficient evidence to establish that he kidnapped the victim in Pennsylvania before killing her in Maryland. Additionally, Appellant contends the court should not have waited until after the degree of guilt hearing to decide his motion to dismiss for lack of jurisdiction. For the following reasons, we hold the Commonwealth presented sufficient evidence to establish Appellant kidnapped the victim in Pennsylvania, which properly established jurisdiction in this Commonwealth. We further hold the court properly waited to consider the facts presented during Appellant's degree of guilt hearing before making its determination regarding jurisdiction. Accordingly, we affirm Appellant's judgment of sentence.

¶ 2 The trial court opinion sets forth the relevant facts and procedural history of this case as follows:

The [Appellant's] relationship with the victim was turbulent, and, at least on one prior occasion, violent. He met Melissa Chamberlain at Kutztown University, where they were both students. On November 15, 2001, [Appellant] pled guilty to two counts of simple assault upon Melissa and her friend, Shawn Clark. During this incident, [Appellant] waited at Melissa's house for an hour. When she arrived, he hit her repeatedly, causing her to fall to the ground. He then choked her until she was breathless and had trouble speaking. He also threatened to kill her. For this offense, he was incarcerated from July 11, 2001 until March 20, 2002. As a condition of his parole, [Appellant] was ordered to not contact Chamberlain.

Despite the no contact order, [Appellant] and Chamberlain continued to write and phone one another. Chamberlain's college roommate during this time period testified that after [Appellant] was released from prison, he stayed with Chamberlain at her dormitory for several days. [Appellant] thereafter moved to Ohio to live with his mother.

At the end of the 2002 semester, Chamberlain's feelings for [Appellant] changed. Chamberlain began dating a childhood friend, Josh Briggs. Her family and friends testified she was in love with Briggs and intended to marry him. She told her friends her relationship with [Appellant] was finished.

In Ohio, [Appellant] was working at a manufacturing plant. After an argument with his mother, he fled to Pennsylvania where he was arrested on an

* Retired Justice assigned to the Superior Court.

1. 18 Pa.C.S.A. § 2502(b).

unrelated charge in Montgomery County on June 27, 2002. [Appellant] phoned Chamberlain and asked her to post his bail. She neither returned his phone call nor paid the requested amount for his release. Defendant was incarcerated until July 11, 2002.

During the summer of 2002, Chamberlain worked as a waitress at a restaurant not far from her home. She had applied for a transfer to Temple University and was looking forward to living at home with her family and being closer to Briggs. Chamberlain had planned a fishing trip with her father, her grandfather, and Briggs for Monday, July 15 near her grandfather's shore home in New Jersey. On Tuesday, July 16, Chamberlain, her mother, and their friends were scheduled to attend a baseball game in Trenton, New Jersey; they had planned this trip several months in advance. Chamberlain was scheduled to work the rest of the week. She also had arranged to shop for her mother's birthday with a family friend on Friday, July 19.

On the morning of July 15, Chamberlain's mother, Patricia Chamberlain, spoke with Melissa while her daughter was in her bedroom packing for the trip to the shore. Melissa said she would call her father who was already in New Jersey after she and Briggs were on their way so that he would know when to expect them. Mrs. Chamberlain reminded Melissa to take cookies she had baked and to charge her cell phone. Mother and daughter also discussed their plans for the rest of the week, including the baseball game. At approximately 8:20 a.m., Mrs. Chamberlain left to go to the gym. Melissa was alone in the house.

Briggs phoned Melissa around 9:00 a.m. She told him she was about to leave, and she would be at his house in a few minutes. After about fifteen to twenty minutes elapsed, Melissa had not yet arrived. Briggs called her cell phone, but she did not answer. He left a message on her voicemail. Several minutes later, he called her again, but she did not answer. Around 9:50 a.m., he called the Chamberlains' phone. Mrs. Chamberlain answered. He told her Melissa never arrived. Both Mrs. Chamberlain and Briggs left their respective houses and drove the route Melissa would have taken to get to Briggs's house in case Melissa had experienced car trouble along the way. They also checked local fast food restaurants hoping Melissa had stopped to buy breakfast. However, they did not find her, and, in fact, they never saw her again.

Upon returning home, Mrs. Chamberlain noticed Melissa's luggage for the shore, her purse, and the cookies Mrs. Chamberlain had prepared were no longer in the house. Also, Mrs. Chamberlain testified when she arrived home from the gym, she noticed on the floor near the door a piece of an acrylic overlay which Melissa had applied to her fingernails. Mrs. Chamberlain called the Middletown Police Department and the District Attorney's office around 11:00 a.m. Through the day friends and family continued to call Melissa's cell phone, but Melissa never returned any of the phone calls.

Four days before, on July 11, [Appellant] was released from Montgomery County Correctional Facility. He phoned a friend from college, Julian Eichert, in the afternoon and asked Eichert for a ride from Philadelphia to his stepfather's apartment. Eichert obliged and took [Appellant] to an apartment complex in Falls Township, which is located in Bucks County near Middletown Township. [Appellant's] stepfather did

not reside at that complex, but he did live nearby.

Between July 12 and July 15, the evidence clearly established that [Appellant] camped near the Chamberlains' house. Following Melissa's disappearance, police detectives searched her neighborhood. Behind a chiropractor's office approximately 150 yards from the Chamberlain residence, they found a lawn furniture mattress with a towel on top of it, plastic gloves, a half-empty jug of orange drink, some food wrappers, and a bag from a local grocery store. DNA testing done on the plastic gloves and the orange drink container matches [Appellant's] DNA. The DNA sample from the gloves was located inside the gloves.

Eyewitnesses also corroborated [Appellant's] presence in the community. On July 12, Nancy Karpinkski, a neighbor of the Chamberlains, saw a man fitting [Appellant's] description walk from behind another neighbor's house down the street to the Chamberlains' house at about 9:00 a.m. She testified the man stood on the Chamberlains' front stoop as though he was about to knock on the front door. On July 14 around 6:00 p.m., two young neighborhood boys, James and Jason Carnley, saw a man they identified as [Appellant] behind the chiropractor's office on their way home from a neighbor's house. [Appellant] told the boys to not enter the property again. Earlier that same day, another witness saw a man fitting [Appellant's] description walk across the street and into the bushes behind the chiropractor's office around 5:30 p.m. Fay Logan and Judith Campanele both saw a man fitting [Appellant's] description in the neighborhood and near the chiropractor's office on July 15 at 8:00 a.m. and 9:00 a.m., respectively.

On July 15, shortly after 9:00 a.m., the circumstantial evidence established that at some point [Appellant] compelled Melissa Chamberlain to drive him to West Ocean City, Maryland where they stayed at the Alamo Motel. [Appellant] registered for two nights under his name and listed his mother's address in Ohio as his home address. His fingerprints were found on the registration card.

The date and location of Melissa's death are uncertain. The evidence, however, strongly suggests she was killed July 15. Her car was found in Newington, Virginia approximately 170 miles from West Ocean City, Maryland in an industrial park. The owner of a building near where the car was parked noticed the car on July 16, 2002 around 7:15 a.m. He phoned police on July 26 to report the unattended vehicle. Police found Miss Chamberlain's body in Trappe, Maryland on August 1, 2002. The medical examiner, Dr. Ana Rubio, gave the time frame within which Melissa had died; Dr. Rubio testified that when the police found Melissa, she had been deceased for at least seven or eight days and up to two or three weeks. Also, the last phone call made from Melissa's cell phone was made on July 15 at 7:40 p.m. The caller had checked her voice mail. Phone records show the call was placed from West Ocean City, Maryland.

[Appellant], after disposing of Melissa's body and car, called Julian Eichert on July 16 at night and requested the phone number of a mutual friend who was living in Pittsburgh. After learning this information, police found and arrested [Appellant] in Pittsburgh on July 25, 2002.

After a lengthy degree of guilt hearing, [Appellant] was convicted of second-degree murder; specifically, it was concluded that [Appellant] kidnapped Melis-

sa Chamberlain on July 15, 2002, took her to West Ocean City, Maryland, and killed her by suffocation.

(Trial Court Opinion, dated 10/01/03, at 1–7). The trial court subsequently sentenced Appellant to life imprisonment. Appellant filed timely post-sentence motions, which the court denied. This appeal followed.

¶ 3 Appellant raises the following issues for our review:

DID THE TRIAL COURT ERR BY FINDING SUFFICIENT EVIDENCE EXISTED TO PROVE BEYOND A REASONABLE DOUBT THAT APPELLANT COMMITTED A KIDNAPPING AND, THEREFORE, COMMITTED SECOND–DEGREE MURDER? WAS THE TRIAL COURT'S FINDING OF SECOND–DEGREE MURDER AGAINST THE WEIGHT OF THE EVIDENCE?

DID THE TRIAL COURT ERR IN DELAYING ITS RULING CONCERNING VENUE AND SUBJECT MATTER JURISDICTION UNTIL AFTER EVIDENCE WAS PRESENTED AT TRIAL?

DID THE TRIAL COURT ERR IN THAT THERE WAS NO SUBJECT MATTER JURISDICTION AND IMPROPER VENUE TO ACCEPT APPELLANT'S PLEA OF GUILT TO THIRD DEGREE MURDER BECAUSE NO EVIDENCE WAS PRESENTED TO SHOW THAT MELISSA CHAMBERLAIN DIED IN ANY OTHER PLACE THAN THE STATE OF MARYLAND AND, AS SUCH, IT WOULD BE IMPOSSIBLE TO PROVE THIRD DEGREE MURDER IN THE COMMONWEALTH OF PENNSYLVANIA?

DID THE TRIAL COURT ABUSE ITS DISCRETION, IN VIOLATION OF PENNSYLVANIA RULES OF EVIDENCE, RULE 404, BY ALLOWING THE COMMONWEALTH TO ADMIT INTO EVIDENCE APPELLANT'S PRIOR CONVICTIONS FOR SIMPLE ASSAULT AGAINST MELISSA CHAMBERLAIN AND SHAWN CLARK?

DID THE TRIAL COURT ABUSE ITS DISCRETION IN VIOLATION OF PENNSYLVANIA RULES OF EVIDENCE, RULE 106, BY PERMITTING THE COMMONWEALTH TO ADMIT INTO EVIDENCE THE CONTENTS OF E–MAILS SENT BY APPELLANT TO MELISSA CHAMBERLAIN WITHOUT REQUIRING THE COMMONWEALTH TO ALSO PRESENT E–MAILS SENT BY MELISSA CHAMBERLAIN IN RESPONSE TO APPELLANT?

DID THE TRIAL COURT ABUSE ITS DISCRETION WHEN IT CONSIDERED THE OPINION OF DR. ANA RUBIO AS TO THE CAUSE OF DEATH OF MELISSA CHAMBERLAIN, WHEN THE OPINION OF THE DOCTOR WAS NOT EXPRESSED TO A REASONABLE DEGREE OF MEDICAL CERTAINTY, RATHER IT DEALT WITH "PROBABILITY"?

(Appellant's Brief at 5–6).[2]

■ ¶ 4 Initially, Appellant argues the Commonwealth did not introduce sufficient evidence to establish he kidnapped the victim. Specifically, Appellant asserts the victim voluntarily left her home to travel to Maryland with Appellant. He concludes the court erred in convicting him of second degree murder where there was insufficient evidence to establish the underlying felony, kidnapping. We disagree.

---

**2.** We have reordered Appellant's issues for ease of disposition.

■ ¶ 5 Our standard of review for claims of sufficiency of evidence is as follows:

The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying [the above] test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Bullick,* 830 A.2d 998, 1000 (Pa.Super.2003) (quoting *Commonwealth v. Gooding,* 818 A.2d 546, 549 (Pa.Super.2003), *appeal denied,* 575 Pa. 691, 835 A.2d 709 (2003)) (internal citations omitted).

■ ¶ 6 Section 2502 of the Crimes Code provides:

§ 2502. Murder

  *   *   *   *   *   *

(b) Murder of the second degree.—A criminal homicide constitutes murder of the second degree when it is committed while defendant was engaged as a principal or an accomplice in the perpetration of a felony.

  *   *   *   *   *   *

(d) Definitions.—As used in this section the following words and phrases shall have the meanings given to them in this subsection:

  *   *   *   *   *   *

"Perpetration of a felony." The act of the defendant in engaging in or being an accomplice in the commission of, or an attempt to commit, or flight after committing, or attempting to commit robbery, rape, or deviate sexual intercourse by force or threat of force, arson, burglary or kidnapping.

18 Pa.C.S.A. § 2502(b), (d) (emphasis added). "Where a murder is alleged to have been committed in the perpetration of a felony, there is no requirement that the defendant actually be charged with the underlying felony." *Commonwealth v. Giles,* 500 Pa. 413, 418, 456 A.2d 1356, 1359 (1983).

¶ 7 Section 2901 of the Crimes Code reads in pertinent part:

§ 2901. Kidnapping

(a) Offense defined.—A person is guilty of kidnapping if he unlawfully removes another a substantial distance under the circumstances from the place where he is found, or if he unlawfully confines another for a substantial period in a place of isolation, with any of the following intentions:

  *   *   *   *   *   *

(3) To inflict bodily injury on or to terrorize the victim or another.

18 Pa.C.S.A. § 2901(a)(3). Furthermore, Section 2901 defines unlawful removal or confinement as follows: "A removal or confinement is unlawful within the meaning of this section if it is accomplished by force, threat or deception[.]" 18 Pa.C.S.A. § 2901(b).

¶ 8 In the instant case, the victim ended her relationship with Appellant some time in late May or early June of 2002, and thereafter refused to accept his phone calls. (N.T. Degree of Guilt Hearing, 4/22/03, at 121–22, 170–72, 208–09). After receiving threatening e-mail messages from Appellant, the victim blocked her e-mail account from receiving further messages from him. (*Id.* at 122, 191, 209–10, 220–21). Furthermore, the victim habitually locked her bedroom windows and doors after learning Appellant had returned to Pennsylvania in the summer of 2002. (*Id.* at 133, 211).

¶ 9 The victim was last seen at her home on the morning of July 15, 2002. The victim's boyfriend telephoned her around 9:00 a.m., and she told him she had finished packing for their family fishing trip and was about to leave her home to pick him up. (*Id.* at 139–42). However, she did not arrive at her boyfriend's home or respond to any of his subsequent calls or messages. (*Id.*) On this same morning, a neighborhood resident observed Appellant walking down the victim's street in the direction of her residence. (N.T. Degree of Guilt Hearing, 4/23/03, at 86). Prior to the victim's disappearance, Appellant constructed a camp site in a secluded area within view of the victim's residence, where he resided for several days. (*Id.* at 19–38). After the victim's disappearance, her mother found a broken acrylic nail belonging to the victim in the entranceway of the home. (N.T. Degree of Guilt Hearing, 4/22/03, at 70–71).

■ ¶ 10 Based on these facts, we agree with the trial court that the victim's relationship with Appellant was such that the victim would not have voluntarily left her home with Appellant or traveled with him to Maryland, especially minutes after she told her boyfriend she was leaving to pick him up to start a family fishing trip. Thus, we conclude the circumstantial evidence established Appellant unlawfully removed the victim from her home by force, threat, or deception. *See* 18 Pa.C.S.A. § 2901(b).

■ ¶ 11 Turning to the remaining elements necessary to establish a kidnapping, investigators found the victim's decomposed body in a wooded area in Trappe, Maryland, a substantial distance from her residence in Levittown, Pennsylvania. Police found a pillowcase hidden in the victim's abandoned car containing blood and saliva matching her DNA. (N.T. Degree of Guilt Hearing, 4/23/03, at 147–50). After a thorough review of the record, including the facts and circumstances explained above, we conclude the Commonwealth presented sufficient evidence to establish beyond a reasonable doubt that Appellant unlawfully removed the victim a substantial distance from her home with the intent to inflict bodily injury or to terrorize her, establishing he kidnapped her under Section 2901. *See Bullick, supra;* 18 Pa. C.S.A. § 2901. *See also Commonwealth v. Auker,* 545 Pa. 521, 681 A.2d 1305 (1996) (holding sufficient evidence to establish kidnapping where victim last seen at mall at defendant's open car door, relationship between them was such that victim would not have voluntarily entered car moments before she was due at work, victim found substantial distance from mall, and victim had stab wounds demonstrating severe bodily injury).

¶ 12 At Appellant's guilty plea colloquy, he admitted to killing the victim. (*See*

N.T. Guilty Plea Colloquy, 4/22/03, at 20–21; Appellant's Brief at 12; Trial Court Opinion at 14). Thus, Appellant killed the victim in the course of committing a felony, kidnapping. *See* 18 Pa.C.S.A. § 2502. Consequently, the Commonwealth presented sufficient evidence to establish second degree murder beyond a reasonable doubt. *See Bullick, supra;* 18 Pa.C.S.A. § 2502(b).

■ ¶ 13 Appellant also contends the weight of the evidence does not support his conviction for second degree murder. Specifically, Appellant asserts there is a lack of credible evidence demonstrating he kidnapped the victim by force. We disagree.

■ ¶ 14 Our standard of review of a weight of the evidence challenge is as follows:

> The weight of the evidence is exclusively for the finder of fact who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. An appellate court cannot substitute its judgment for that of the finder of fact. Thus, we may only reverse the jury's verdict if it is so contrary to the evidence as to shock one's sense of justice.

*Gooding, supra* at 551 (Pa.Super.2003) (quoting *Commonwealth v. Begley,* 566 Pa. 239, 263, 780 A.2d 605, 619 (2001)).

¶ 15 Preliminarily, we note Appellant's weight of evidence argument is essentially a rehashing of his previous sufficiency challenge. In the interest of justice, however, we have attempted to frame this issue as a weight of the evidence claim.

¶ 16 Here, Appellant claims the victim voluntarily left her home and traveled with him to Maryland. Appellant notes that none of the victim's neighbors witnessed a struggle, the victim's home was locked and undisturbed, and Appellant made no attempt to hide the victim during their "trip" to Maryland. We agree with Appellant there is little evidence of a struggle at the victim's home, apart from the victim's broken acrylic nail found on the floor. However, the lack of evidence of a physical struggle is not dispositive of this issue. As discussed above, there is ample circumstantial evidence to establish beyond a reasonable doubt that Appellant unlawfully removed the victim from her home either by threat or deception. *See* 18 Pa.C.S.A. § 2901. After a thorough review of the record, we conclude Appellant's conviction does not shock the judicial conscience. *See Gooding, supra.* Thus, Appellant's weight of the evidence claim is without merit.

¶ 17 Appellant next argues the trial court should not have delayed ruling on his motion to dismiss for lack of subject matter jurisdiction and venue. Appellant complains the court improperly relinquished the issues of venue and jurisdiction to the trier of fact. In addition, Appellant argues Pennsylvania courts were without jurisdiction to hear his case because the homicide occurred in Maryland. We disagree.

¶ 18 Section 102 of the Crimes Code provides in pertinent part:

§ 102. Territorial applicability

> (a) General rule.—Except as otherwise provided in this section, a person may be convicted under the law of this Commonwealth of an offense committed by his own conduct or the conduct of another for which he is legally accountable if either:
>
> > (1) the conduct which is an element of the offense or the result which is such an element occurs within this Commonwealth[.]

18 Pa.C.S.A. § 102(a)(1).

■ ¶ 19 Upon entering a guilty plea, a defendant waives his right to chal-

lenge on appeal all non-jurisdictional defects except the legality of his sentence and the validity of his plea. *Commonwealth v. Myers,* 481 Pa. 217, 221, 392 A.2d 685, 687 (1978).

> Jurisdiction is a legal issue and therefore is not normally a concern for the jury. However, in those infrequent cases where jurisdiction depends upon the resolution of disputed facts, it is within the province of the jury to resolve the issue under proper instructions, and failure to give such instructions may constitute reversible error.

*Commonwealth v. Duden,* 326 Pa.Super. 73, 473 A.2d 614, 621 (Pa.Super.1984) (citing *Commonwealth v. Mull,* 316 Pa. 424, 175 A. 418 (1934)). For a county to exercise jurisdiction over a criminal case, an overt act involved in the crime must have occurred within that county. *Commonwealth v. Bradfield,* 352 Pa.Super. 466, 508 A.2d 568, 571 (1986), *appeal denied,* 513 Pa. 633, 520 A.2d 1384 (1987) (citing *Commonwealth v. Tumolo,* 455 Pa. 424, 427, 317 A.2d 295, 297 (1974)). "While the Commonwealth bears the burden of proving facts sufficient to establish jurisdiction, it may rely upon circumstantial evidence to meet its burden." *Bradfield, supra.*

■ ¶ 20 Presently, Appellant plotted, planned, and executed a kidnapping in Bucks County, Pennsylvania that culminated in the victim's murder in Maryland. While the murder occurred in Maryland, a requisite element of Appellant's second degree murder conviction, the kidnapping, was committed in Pennsylvania. *See Bradfield, supra. See also Commonwealth v. Lewis,* 423 Pa.Super. 94, 620 A.2d 516 (1993), *appeal denied,* 534 Pa. 653, 627 A.2d 730 (1993) (holding Pennsylvania had jurisdiction over homicide in New York because homicide was committed in furtherance of robbery in Pennsylvania, a necessary element of second de-

gree murder charge). Therefore, the trial court properly assumed jurisdiction over the homicide. *See Bradfield, supra;* 18 Pa.C.S.A. § 102(a)(1).

■ ¶ 21 Furthermore, the trial court could not make this jurisdictional determination until it first determined whether the facts established that Appellant kidnapped the victim. Consistent with this Court's reasoning in *Duden, supra,* the court reserved the jurisdictional question for itself as the trier of fact, to be determined after all the evidence concerning the kidnapping had been admitted. Under these circumstances, the court, as finder of fact, properly delayed its ruling on Appellant's motion to dismiss until it resolved this factual dispute. *See Duden, supra* (explaining jurisdiction question may be submitted to jury as fact finder when jurisdiction depends on resolution of certain facts).

¶ 22 In a related argument, Appellant asserts the court had no power to hold a degree of guilt hearing because the court's jurisdiction was not conclusively established at the hearing's outset. Appellant argues the court had no jurisdiction to accept a guilty plea to third degree murder because the murder occurred in Maryland. Thus, had the Commonwealth failed to prove second degree or first degree murder beyond a reasonable doubt, the court would have been without jurisdiction to enter a third degree conviction. Essentially, Appellant believes the court had to establish absolute jurisdiction before deciding his degree of guilt. We disagree.

■ ¶ 23 A plea of guilty to murder generally is a defendant's acknowledgement that he participated in certain acts with criminal intent. *Commonwealth v. Mitchell,* 528 Pa. 546, 550, 599 A.2d 624, 626 (1991). After such a plea, the trial court must hold a degree of guilt hearing to determine whether the homicide was

murder of the first, second, or third degree, or voluntary manslaughter. *See Myers, supra* at 221, 392 A.2d at 687. The Commonwealth has the burden to prove, beyond a reasonable doubt, a higher degree of murder than third degree. *Commonwealth v. Flanagan,* 854 A.2d 489, 494, (Pa.2004). The judge before whom the plea was entered will determine the degree of guilt. Pa.R.Crim.P. 590(c).

¶ 24 This Court has recently addressed the distinction between a plea of guilty and a plea of guilty to murder generally:

> A plea of guilty to murder generally is a unique plea, unlike anything else provided in statute or decisional law. It appears to be like a guilty plea because the defendant concedes at least some level of guilt. But the option of proceeding under Rule 590(c) is not the same as a defendant pleading guilty to the charges filed against her. In a guilty plea, no evidence is presented against the defendant. The judge in her colloquy merely assures that the defendant is aware of the facts underlying the plea. A Rule 590(c) proceeding, on the other hand still requires the presentation of evidence, the arguments of counsel and the finding of facts in support of a verdict. As a practical matter, the procedure set out in Rule 590(c) is akin to a bench or waiver trial. The criminal defendant first waives her right to be tried by a jury. Thereafter, evidence is presented against her by the district attorney and her counsel advocates on her behalf *via* testimony, argument or both. At the end of this proceeding, a verdict is rendered by the court. The Rule in essence provides for a form of a waiver trial for the defendant facing murder charges.

*Commonwealth v. White,* 818 A.2d 555, 562 (Pa.Super.2003), *appeal granted,* 577 Pa. 316, 845 A.2d 199 (2004) (footnote omitted) (emphasis in original).

¶ 25 Instantly, Appellant misapprehends the nature of his guilty plea to murder generally. By proceeding under Rule 590(c), Appellant's plea of guilty to murder generally required presentation of evidence against him. *See White, supra.* Until the court heard this evidence, it could not determine Appellant's degree of guilt, nor its jurisdiction. *Id.* The trial court concedes it lacked jurisdiction to convict Appellant of third degree murder, and would have had to divest itself of jurisdiction had the Commonwealth failed to prove first or second degree murder beyond a reasonable doubt. (*See* Trial Court Opinion at 11). However, as we have previously determined, the court properly established its jurisdiction upon finding Appellant kidnapped the victim in Pennsylvania. Consequently, this issue is without merit.

¶ 26 Appellant also asserts the trial court should not have admitted into evidence Appellant's prior convictions for simple assault against the victim and Shawn Clark. Appellant argues the assault should be viewed as an isolated incident that was not part of the sequence of events leading up to the murder. We disagree.

¶ 27 Our standard of review for claims of admissibility of evidence is as follows:

> Admission of evidence is within the sound discretion of the trial court and will be reversed only upon a showing that the trial court clearly abused its discretion. Admissibility depends on relevance and probative value. Evidence is relevant if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable or supports a reasonable

inference or presumption regarding a material fact.

*Commonwealth v. Drumheller*, 570 Pa. 117, 135, 808 A.2d 893, 904 (2002), *cert. denied*, 539 U.S. 919, 123 S.Ct. 2284, 156 L.Ed.2d 137 (2003) (quoting *Commonwealth v. Stallworth*, 566 Pa. 349, 363, 781 A.2d 110, 117–18 (2001)).

■ ¶ 28 "The harmless error doctrine, as adopted in Pennsylvania, reflects the reality that the accused is entitled to a fair trial, not a perfect trial." *Commonwealth v. Drummond*, 775 A.2d 849, 853 (Pa.Super.2001), *appeal denied*, 567 Pa. 756, 790 A.2d 1013 (2001). However:

> It is well established that an error is harmless only if we are convinced beyond a reasonable doubt that there is no reasonable possibility that the error could have contributed to the verdict. The Commonwealth bears the burden of establishing the harmlessness of the error. This burden is satisfied when the Commonwealth is able to show that: (1) the error did not prejudice the defendant or the prejudice was *de minimis;* or (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial [e]ffect of the error so insignificant by comparison that the error could not have contributed to the verdict.

*Commonwealth v. Laich*, 566 Pa. 19, 29, 777 A.2d 1057, 1062–63 (2001) (citing *Commonwealth v. Ardestani*, 558 Pa. 191, 736 A.2d 552 (1999)) (internal citations omitted).

■ ¶ 29 Rule 404 of the Pennsylvania Rules of Evidence provides in pertinent part:

> Rule 404. Character evidence not admissible to prove conduct; exceptions; other crimes
>
> \*　\*　\*　\*　\*　\*
>
> (b) Other Crimes, Wrongs, or Acts
>
> (1) Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.
>
> (2) Evidence of other crimes, wrongs, or acts may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident.
>
> (3) Evidence of other crimes, wrongs, or acts proffered under subsection (b)(2) of this rule may be admitted in a criminal case only upon a showing that the probative value of the evidence outweighs its potential for prejudice.

Pa.R.E. 404(b)(1–3). Evidence of prior bad acts is also admissible where the particular crime or act was part of a chain, sequence, or natural development of events forming the history of a case. *Drumheller, supra* at 137, 808 A.2d at 905 (citing *Commonwealth v. Walker*, 540 Pa. 80, 656 A.2d 90 (1995), *cert. denied*, 516 U.S. 854, 116 S.Ct. 156, 133 L.Ed.2d 100 (1995)). Furthermore, evidence of prior abuse between a defendant and a homicide victim tending to establish motive, intent, malice, or ill will is generally admissible. *Commonwealth v. Chandler*, 554 Pa. 401, 409, 721 A.2d 1040, 1044 (1998).

¶ 30 Instantly, Appellant physically attacked the victim and her male friend, Shawn Clark, on July 7, 2001. During this attack, Appellant threatened the victim by stating "if he couldn't have her nobody could" and "he was not afraid to die and would take her with him." (N.T. Degree of Guilt Hearing, 4/22/03, at 178–86; Affidavit of Probable Cause, Common-

wealth Exhibit C–15). Appellant pled guilty to two counts of simple assault resulting from this attack and was incarcerated. These prior assaults and the accompanying threats were admitted into evidence at the degree of guilt hearing to demonstrate Appellant's motive for the subsequent kidnapping and murder, as well as his malice towards the victim. (*Id.*) *See Chandler, supra.* Furthermore, this attack was part of the sequence of events illustrating the deteriorating nature of Appellant's relationship with the victim prior to the kidnapping and murder. *See Drumheller, supra; Walker, supra.* Based on these considerations, we conclude the trial court properly admitted the evidence of Appellant's prior bad acts.

¶ 31 Appellant next argues the e-mails he wrote to the victim should not have been admitted because some of the victim's response e-mails could not be recovered from her computer. Appellant concludes his e-mails to the victim were taken out of context and should have been excluded from evidence. We disagree.

¶ 32 Rule 106 of the Pennsylvania Rules of Evidence provides:

Rule 106. Remainder of related writings or recorded statements

> When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it.

Pa.R.E. 106. Furthermore, the comment to Rule 106 states:

> The purpose of Pa.R.E. 106 is to give the adverse party an opportunity to correct a misleading impression that may be created by the use of portions of a writing or recorded statement that are taken out of context. This rule gives the adverse party the right to correct the misleading impression at the time that the evidence is introduced. The trial court has discretion to decide whether other parts, or other writings or recorded statements, ought in fairness to be considered contemporaneously with the original portion.

Pa.R.E. 106, comment.

¶ 33 In the instant case, the Federal Bureau of Investigation ("F.B.I.") and an expert retained by the defense analyzed the computers of the victim and Appellant's mother. (N.T. Degree of Guilt Hearing, 4/24/03, at 114). Neither the F.B.I. nor defense counsel's expert was able to recover all of the e-mails sent by the victim. (*Id.*) However, all recovered e-mails were admitted contemporaneously at the degree of guilt hearing, including six e-mails sent by the victim to Appellant. (*See* Trial Court Opinion at 12).

¶ 34 We agree with the trial court that "Rule 106 is not an exclusionary rule, but, rather, it merely permits the adverse party to introduce related writings so that the documents originally introduced are not read out of context." (*Id.*) Contrary to Appellant's contention, Rule 106 does not mandate a blanket admission of all correspondence and related writings. Rather, the rule's primary purpose is to correct misleading or impartial evidence. *See* Pa.R.E. 106, comment.

¶ 35 The Commonwealth introduced the e-mail dialogue to demonstrate Appellant's increasing anger and frustration toward the victim due to her decision to end her previous relationship with Appellant and her new romantic relationship. Appellant's e-mails to the victim did not create a misleading impression of him, especially when considered in tandem with the other evidence concerning Appellant's pre-kidnapping attitude toward the victim. *See Mitchell, supra;* Pa.R.E. 106 comment.

The trial court did not have to exclude all the e-mails between Appellant and the victim because some of the victim's responses could not be recovered. Therefore, the trial court did not abuse its discretion by admitting all of the recoverable e-mails. *See Drumheller, supra.*

¶ 36 Finally, Appellant asserts the trial court improperly considered the opinion of Dr. Ana Rubio as to the cause of the victim's death. Specifically, Appellant argues Dr. Rubio did not offer her opinion with a reasonable degree of medical certainty because she testified the cause of the victim's death was "probably asphyxia". Appellant concludes this error entitles him to a new trial. We agree, in part.

¶ 37 To allow the trier of fact to consider an expert medical opinion on the cause of a death, the expert must offer his opinion to a reasonable degree of medical certainty. *Commonwealth v. Williams*, 455 Pa. 539, 545, 316 A.2d 888, 891 (1974). "The test of reasonable doubt is a legal one and it is the test that the jury must use in determining whether the expert opinion taken together with all of the other evidence in the case warrants the finding of the cause of death as suggested by the expert, beyond a reasonable doubt." *Id.* (citing *Commonwealth v. Webb*, 449 Pa. 490, 496, 296 A.2d 734, 737 (1972)).

¶ 38 In the instant case, Dr. Rubio, a forensic pathologist and the Assistant Medical Examiner for the State of Maryland, examined the body of the victim. She testified the victim's body was in advanced stages of decomposition and partially skeletonized. (N.T. Degree of Guilt Hearing, 4/24/03, at 50–51). Although Dr. Rubio was unable to observe any evidence of traumatic injury, she was able to eliminate various causes of death. (*Id.* at 60–62). Based on information gathered from investigation of the crime scene, examina-

tion of the body, the toxicology report, and the DNA match of saliva and blood on a pillow case to the victim, she determined asphyxia was "most likely" the cause of death. (*Id.* at 60–64). Dr. Rubio did not state her medical opinion to a reasonable degree of medical certainty during direct examination.

¶ 39 During the cross-examination of Dr. Rubio, however, Appellant's trial counsel initiated the following exchange:

Q. You're not sure it's asphyxia that occurred here, correct?

A. I don't have all of the evidence that would make me say purely asphyxia.

Q. So you can't offer an opinion to a reasonable degree of medical certainty that asphyxia occurred here; correct?

A. I offer an opinion to a reasonable degree of medical certainty that it is probably asphyxia.

Q. Probably is not certain, correct?

A. Probably is not certain.

(*Id.* at 68) (emphasis added).

¶ 40 We agree with Appellant that Dr. Rubio's use of the word "probably" to qualify her medical opinion directly contravenes the "reasonable certainty" of her opinion. *See Commonwealth v. Stoltzfus*, 462 Pa. 43, 337 A.2d 873 (1975) (holding medical expert's testimony as to cause of death properly admitted because expert did not state head injury "probably" caused death, but rather testified emphatically and without qualification as to cause of death). *See also Commonwealth v. Radford*, 428 Pa. 279, 236 A.2d 802 (1968) (holding medical expert's testimony as to cause of death insufficient because he stated defendant's assault on victim "probably" caused his death). Nevertheless, the court convicted Appellant of second degree murder based on its finding that Appellant kidnapped the victim in Pennsylvania, and

Appellant's admission to killing the victim. The method of Appellant's murder, whether strangulation or suffocation, had no bearing on the court's second degree murder conviction. Therefore, the admission of this testimony amounted to no more than harmless error. *See Drummond, supra.*

¶ 41 For the foregoing reasons, we hold the Commonwealth presented sufficient evidence to establish Appellant kidnapped the victim in Pennsylvania, which properly established jurisdiction in this Commonwealth. We further hold the court properly considered the facts presented during Appellant's degree of guilt hearing before making its ultimate determination regarding jurisdiction. Accordingly, we affirm Appellant's judgment of sentence of life imprisonment for second degree murder.

¶ 42 Judgment of sentence affirmed.