J-S43044-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
                                                     :            PENNSYLVANIA
                                                     :

              v.                                        :

SAIBEL RONDON VILLEGAS           :
                                                     :
              Appellant                    :     No. 129 MDA 2019

Appeal from the Judgment of Sentence Entered December 5, 2018
In the Court of Common Pleas of Dauphin County Criminal Division at
No(s):  CP-22-CR-0005016-2015

BEFORE:   GANTMAN, P.J.E., DUBOW, J., and STEVENS*, P.J.E.

MEMORANDUM BY STEVENS, P.J.E.:           **FILED OCTOBER 10, 2019**

Appellant, Saibel Rondon Villegas, appeals from the judgment of sentence entered in the Court of Common Pleas of Dauphin County after a jury found her guilty of criminal conspiracy to commit fraud and acquisition of a controlled substance.   Sentenced to five and one-half to 15 years' incarceration, Appellant raises alternative challenges to the sufficiency and weight of the evidence, and she claims the court abused its sentencing discretion in imposing what she labels a manifestly excessive sentence.  We affirm.

The trial court has aptly summarized the factual history of this case by describing how Appellant used her position as a medical assistant in a physician's office to supply prescription papers to other actors involved in a fraudulent prescription drug distribution scheme.  **See** generally, Trial Court Opinion, 5/2/19, at 1-7.  As noted, **supra**, a two-day jury trial resulted in

_____
*   Former Justice specially assigned to the Superior Court.

guilty verdicts on all counts against Appellant, and, on December 5, 2018, the court sentenced her to five and one-half to 15 years of imprisonment, plus fines and costs, with RRRI eligibility commencing at 55 months into her sentence. Appellant filed a timely post-sentence motion, which the trial court denied. This timely appeal followed.

On appeal, Appellant raises the following three issues for our consideration.

1. Whether the evidence presented by the Commonwealth at trial was insufficient to prove acquisition of a controlled substance by fraud and conspiracy beyond a reasonable doubt?

2. Whether the trial court abused its discretion when it denied Appellant's post sentence motion based on the weight of the evidence?

3. Whether the trial court abused its discretion when it imposed a five and a half to fifteen years sentence where Appellant's conduct was not so egregious to warrant such a sentence?

Appellant's brief, at 9.

Initially, we set forth the standard of review applicable to each of Appellant's three issues. With respect to Appellant's sufficiency claim, we apply the following standard:

A challenge to the sufficiency of the evidence is a question of law, subject to plenary review. When reviewing a sufficiency of the evidence claim, the appellate court must review all of the evidence and all reasonable inferences drawn therefrom in the light most favorable to the Commonwealth, as the verdict winner. Evidence will be deemed to support the verdict when it establishes each element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. The Commonwealth need not preclude every possibility of innocence or establish the

defendant's guilt to a mathematical certainty. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Teems*, 74 A.3d 142, 144-45 (Pa.Super. 2013) (citation omitted).

A person commits the crime of unlawful acquisition of a controlled substance if she acquires or obtains possession of a controlled substance "by misrepresentation, fraud, forgery, deception or subterfuge." 35 P.S. § 780-113(a)(12). *Commonwealth v. Farone*, 808 A.2d 580, 581 (Pa.Super. 2002).

Regarding the charge of conspiracy to commit the above crime, the Commonwealth must prove three elements: "1) an agreement, 2) shared criminal intent, and 3) an overt act." *Commonwealth v. Johnson*, 180 A.3d 474, 479 (Pa.Super. 2018), *citing* 18 Pa.C.S.A. § 903. Moreover,

> the essence of a criminal conspiracy is a common understanding, no matter how it came into being, that a particular criminal objective be accomplished. Therefore, a conviction for conspiracy requires proof of the existence of a shared criminal intent. An explicit or formal agreement to commit crimes can seldom, if ever, be proved and it need not be, for proof of a criminal partnership is almost invariably extracted from the circumstances that attend its activities. Thus, a conspiracy may be inferred where it is demonstrated that the relation, conduct, or circumstances of the parties, and the overt acts of the co-conspirators sufficiently prove the formation of a criminal confederation. The conduct of the parties and the circumstances surrounding their conduct may create a web of evidence linking the accused to the alleged conspiracy beyond a reasonable doubt. Even if the conspirator did not act as a principal in committing the underlying crime, [she] is still criminally liable for the actions of his co-conspirators taken in furtherance of the conspiracy.

*Johnson*, 180 A.3d at 479 (internal citation omitted).

Appellant's second and third issues, which challenge the weight of the evidence and the discretionary aspects of sentencing, respectively, implicate the court's exercise of discretion.

> We do not review challenges to the weight of the evidence *de novo* on appeal. *See Commonwealth v. Rivera*, 603 Pa. 340, 983 A.2d 1211, 1225 (Pa. 2009). Rather, we only review the trial court's exercise of its discretionary judgment regarding the weight of the evidence presented at trial. *See id*.
>
> "[W]e may only reverse the lower court's verdict if it is so contrary to the evidence as to shock one's sense of justice." *Commonwealth v. Champney*, 574 Pa. 435, 832 A.2d 403, 408 (2003) (citations omitted). A verdict is said to be contrary to the evidence such that it shocks one's sense of justice when "the figure of Justice totters on her pedestal," or when "the jury's verdict, at the time of its rendition, causes the trial judge to lose his breath, temporarily, and causes him to almost fall from the bench, then it is truly shocking to the judicial conscience." *Commonwealth v. Davidson*, 860 A.2d 575, 581 (Pa. Super. 2004) (citations omitted).

*Commonwealth v. Lineman*, --- A.3d----, 2019 PA Super 283 (Pa.Super. filed Sept. 16, 2019).

Challenges to the discretionary aspects of sentencing are not automatically reviewable as a matter of right. *Commonwealth v. Hunter*, 768 A.2d 1136, 1144 (Pa.Super. 2001). Prior to reaching the merits of a discretionary sentencing issue, we must determine: (1) whether an appellant has filed a timely notice of appeal; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence; (3) whether an appellant's brief sufficiently addresses the challenge in a

statement included pursuant to Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code. **Commonwealth v. Evans**, 901 A.2d 528, 533 (Pa.Super. 2006).

Here, the trial court has authored a cogent and comprehensive opinion that thoroughly addresses and disposes of Appellant's claims on appeal. Specifically, the trial court opines that evidence viewed in a light most favorable to the Commonwealth as verdict-winner sufficed to convict Appellant of the crimes charged. We agree.

Uncontested testimony established that Appellant was a medical assistant and sole employee working in the office of a physician, whose name and DEA number had appeared on numerous fraudulent prescriptions for oxycodone. Appellant had access to both the physician's prescription notepad and his DEA number, and evidence established that she had verified fraudulent prescriptions when the pharmacy called for confirmation. Moreover, several names appearing on the fraudulent prescriptions belonged to Appellant's relatives.

A co-conspirator in the scheme testified that she would pay about $1,000 to Appellant in exchange for a prescription of between 100 and 180 oxycodone pills, which had a street value of $15.00 per pill. Appellant denied knowing the co-conspirator, but a consent search of her cell phone disclosed an email containing the co-conspirator's email address, a notation to her first name, "Sharde," and a reference to Appellant's nickname.

Investigators placed Appellant under arrest, and a warrant search of her purse—which, she warned police, contained a handgun—revealed sticky notes with five names and dates of birth matching those appearing on the fraudulent prescriptions. Additionally, GPS location retrieval from Appellant's cell phone showed Appellant's phone had been at the co-conspirator's house, and an extracted email read, in part, "getting my money from Sharde." Collectively, this evidence sufficed to prove each element of the Unlawful Acquisition and Conspiracy charges against Appellant, and for this reason, we reject Appellant's sufficiency of the evidence challenge.

With respect to Appellant's weight of the evidence claim, the trial court acknowledges evidence that one fraudulent prescription had not been verified by Appellant and that the co-conspirator and another person involved in the scheme were printing their own prescriptions at their property. Nevertheless, the court concluded that such evidence "does not nullify the evidence of [Appellant's] involvement and conviction." TCO, at 8.

We agree, because the jury was free to believe the co-conspirator's testimony as the only alleged eyewitness to Appellant's role in the illegal scheme, and ample evidence supported her testimony. The court determined that the verdict did not shock the conscience, and we discern no reason to disturb this determination.

Finally, the court's opinion reasonably disposes of Appellant's claim that the imposition of a standard-range sentence under the circumstances constituted a manifestly excessive sentence. We note, initially, that Appellant

properly preserved this issue—that the sentencing court failed to consider rehabilitative needs and mitigating factors, which called for a lower sentence than the standard range sentence she received—by preserving the issue in a Post-Sentence Motion and including a statement pursuant to Pa.R.A.P. 2119(f) in her brief.

Proceeding to whether this sentencing challenge raises a substantial question for our review, we observe that this Court makes such a determination on a case-by-case basis. ***Commonwealth v. Moury***, 992 A.2d 162, 170 (Pa.Super. 2010). "A substantial question exists only when the appellant advances a colorable argument that the sentencing judge's actions were either: (1) inconsistent with a specific provision of the Sentencing Code; or (2) contrary to the fundamental norms which underlie the sentencing process." ***Id.*** (citation and quotation omitted).

Here, the trial court imposed a standard range sentence, but Appellant avers that the trial court should have imposed a lesser sentence based on her lack of a previous criminal history, the non-violent nature of the offenses, her law-abiding and self-sufficient conduct during her three-year pretrial release in the community, and the needs of her minor daughter and physically impaired husband. Appellant's brief at 22-23.

Claims that the sentencing court did not adequately consider mitigating factors generally do not raise a substantial question. ***Commonwealth v. Disalvo***, 70 A.3d 900, 903 (Pa. Super. 2013). A specific claim that the court refused to weigh mitigating factors as an appellant wished, absent more, does

not raise a substantial question. ***Moury***, 992 A.2d at 175; ***Commonwealth v. Zirkle***, 107 A.3d 127, 133 (Pa. Super. 2014) ("[W]e have held that a claim that a court did not weigh the factors as an appellant wishes does not raise a substantial question").

Assuming, *arguendo*, that Appellant's claim presents a substantial question warranting merits review, we turn to the trial court's explanation of its sentence, in which it notes that it considered the pre-sentence investigation report and was aware of "all aspects of [Appellant's] background." TCO, at 13. The court fairly emphasized, however, that Appellant was a central figure in a "major criminal enterprise that put 15,000 pills on the street[,]" contributing to a process that "create[s] violent and dangerous and destructive aspects throughout our society." TCO, at 12, 13. The court further considered the effect Appellant's crime had on the physician's position of trust in society and the extended length of time the criminal enterprise lasted. For these reasons, it deemed a standard range sentence appropriate, and we discern nothing in either the record or Appellant's argument to warrant disrupting the sentence imposed.

Therefore, following our careful review of the record, party briefs, and relevant law, we perceive no merit to Appellant's appeal. The opinion of the Honorable Scott Arthur Evans is consistent with our view in this regard, such that we may adopt it as our own for purposes of accomplishing appellate review. Accordingly, we affirm on the basis of the rationale stated therein.

Judgment of sentence affirmed.

J-S43044-19

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/10/2019

COMMONWEALTH OF PENNSYLVANIA : IN THE COURT OF COMMON PLEAS
: DAUPHIN COUNTY, PENNSYLVANIA
:
:
vs. : NO. 5016-CR-2015
:
:
SAIBEL RONDON VILLEGAS :

## MEMORANDUM OPINION

Defendant Saibel Rondon Villegas has appealed from a judgment of sentence following a conviction of criminal conspiracy to commit fraud and acquisition of a controlled substance. Defendant was found guilty after a jury trial on September 26, 2018, and was sentenced on December 5, 2018 to five and one-half (5 ½) to fifteen (15) years of imprisonment. The following issues have been raised in Defendant's statement of errors complained of on appeal:

1.  The evidence presented by the Commonwealth at trial was not sufficient to prove the substantive offense and the conspiracy to acquisition of a controlled substance by fraud.

2.  The trial court erred when denying Defendant's motion for a new trial based on the weight of the evidence.

3.  The sentence imposed by the trial court is unreasonable and excessive under the circumstances in this matter.

The following evidence was adduced at trial. Subha Iyer testified for the Commonwealth. Mrs. Iyer is an immigration attorney, is married to Dr. Viswanathan Iyer, and works as a part-time office manager in her husband's medical practice. She identified Defendant as a former employee/medical assistant in Dr. Iyer's medical office, stating that Defendant worked there from approximately June of 2013 to the first week in April, 2015. [Jury Trial, September 25, 2018, Vol. I, pp. 5-7]. According to Mrs. Iyer, as a medical assistant, Defendant worked Monday through Friday, and her duties included calling patients for appointments,

1



checking them in, and ordering lab work. At the end of March, 2015, Mrs. Iyer was filling in for Defendant and received a telephone call from a pharmacist at Rite Aid, wanting to verify that Dr. Iyer had ordered a prescription of oxycodone. She believes she was given the last name "Colon" and Mrs. Iyer determined it was someone who was not in Dr. Iyer's medical records, either as a regular patient or one Dr. Iyer had seen in the hospital. She called the pharmacy back to let them know the prescription had not come from Dr. Iyer's office and asked them to not give any medications to that patient. Mrs. Iyer also testified that Dr. Iyer kept his prescription notepads in his office, usually with one in his pocket and the rest in a safe place. [N.T., 9-25-18, Vol. I, pp. 8-10].

Dr. Iyer also testified. He is a kidney doctor, specializing in hypertension internal medicine and has been in the medical field for over twenty years. Dr. Iyer's practice is located in a medical office building behind Holy Spirit Hospital in Camp Hill, Pennsylvania. Dr. Iyer testified that in June of 2014, Defendant Villegas was his only employee, also noting that his wife helped out occasionally. Dr. Iyer confirmed that he prescribes drugs, but prescribes oxycodone "very rarely." He attested that he is not a primary care physician for most patients but, rather, a consultant. Thus, generally he does not have to prescribe pain medications to patients. [N.T., 9-25-18, Vol. I, pp. 14-18]. Dr. Iyer indicated that prescription medications must be handwritten on prescription slips, which come from an outside company who prints and sends them to the office. He stated that he keeps his prescription pad in his pocket most of the time, but also on his table or inside of a drawer. Dr. Iyer also testified that he is at the hospital nearly every day, so there is a lot of back-and-forth. [N.T., 9-25-18, Vol. I, pp. 19-20].

At trial, Dr. Iyer was presented with prescription images for any oxycodone product written by DEA number FI0288452 during the time frame from January 1, 2013 through January

2

1, 2016. Referring to Commonwealth's Exhibit 2, Dr. Iyer testified that all prescriptions reflected in such exhibit were prescriptions written by him; it was his handwriting and he recognized the patients' names. In contrast, referring to Commonwealth's Exhibit 3, Dr. Iyer testified that those prescriptions were not written by him; the handwriting was not his, the patient names were not known to him, and the "style" of the prescriptions were completely different. [N.T., 9-25-18, Vol. I, pp. 20-23]. Dr. Iyer also testified that he does not include his DEA number when he is writing a prescription because the pharmacies that he uses already have his DEA number on file and know who he is. In Commonwealth's Exhibit 3, Dr. Iyer noted that nearly all of the prescriptions included his DEA number. He acknowledged that it was very likely that Defendant had access to his DEA number in the course of her employment. Dr. Iyer also observed that the Exhibit 3 prescription paper looked a bit different both in size and in font than the ones he uses, and the telephone number provided was not his office phone number. Finally, Dr. Iyer explained that he doesn't generally prescribe straight oxycodone. Rather, as reflected by the prescriptions actually written by him, a combination of two pain pills is given. For example, oxycodone acetaminophen (also known as Percocet) or oxycodone hydrochloride. [N.T., 9-25-18, Vol. I, pp. 23-29].

Sharde Chenault, who was charged as a co-conspirator in this case, also testified on behalf of the Commonwealth. Ms. Chenault attested that while she was hoping to receive some sort of credit or consideration for her testimony, the prosecution made no promises, negotiation, or plea deal with her. [N.T., 9-25-18, Vol. I, p. 39]. Ms. Chenault explained that she knew Defendant by the name "Choo-choo," and they met through a mutual friend. Ms. Chenault was referred to Defendant and put in contact with her to obtain prescriptions for oxycodone. Ms. Chenault communicated with Defendant starting in 2014 via telephone calls or text messages.

3

Ms. Chenault would meet Defendant and would pay her for a prescription paper. The meeting places varied – Ms. Chenault's house on Boas Street in Harrisburg or the parking lot at Dr. Iyer's medical office. At times Ms. Chenault would take the prescription papers out of Defendant's car and paid her later. Ms. Chenault testified that she would pay around $1,000 for a prescription, depending on the quantity and strength of the oxycodone. She also attested that Defendant would write the names and fill out the prescriptions, but Ms. Chenault did that herself sometimes as well. When asked if she recognized of the names written on the prescriptions in Commonwealth's Exhibit 3, Ms. Chenault admitted to recognizing some, and specified that Isabel Colon was one of Defendant's family members. Ms. Chenault also knew Krystal Lopez. After Ms. Chenault received the prescription from Defendant, she would give it to Ms. Lopez to get it filled at Rite Aid. After Ms. Lopez would get the prescriptions filled, she would bring them to Ms. Chenault, who would sell each pill for $15.00. Each prescription was made out for between 100 and 180 pills. [N.T., 9-25-18, Vol. I, pp. 40-49].

When Ms. Chenault was asked about Dr. Iyer's testimony regarding the discrepancy in some of the printed prescription papers, she stated that she thought that might be true but was not sure. She also admitted that the police found a printer and blank prescription paper at her home, and claimed that Ms. Lopez was the one who was printing the prescriptions. Ms. Chenault was "not sure" when asked why she or Ms. Lopez started printing the prescriptions rather than getting the prescription papers from Defendant. [N.T., 9-25-18, Vol. I, p, 50].

Aaron Osman, a patrol sergeant with the Susquehanna Township Police Department also testified on behalf of the Commonwealth. Sergeant Osman was assigned to this case after a pharmacist at Rite Aid contacted the police department. Specifically, Rite Aid had received a couple of fraudulent prescriptions which were confirmed with phone calls to Dr. Iyer's office. In

order to make an arrest, Rite Aid flagged two prescriptions as fake/fraudulent. They were dropped off by a female at a Rite Aid pharmacy at 3601 Walnut Street. One was in the name of Isabel Colon with a notation on it in the upper left-hand corner that read, "per Saibel, not a patient of Dr. Iyer." When she called to ask what time the prescription would be ready, the pharmacist gave her a time and Sergeant Osman waited at the store for her to pick it up. Sergeant Osman waited for hours and the woman, later identified as Krystal Lopez, came in as he was leaving, so Detective Torasi was the one to physically take her into custody. [N.T., 9-26-18, Vol. II, pp. 118-124]. Through the course of the investigation, Sergeant Osman learned that Ms. Lopez was working for Sharde Chenault. Sergeant Osman got a search warrant for Ms. Chenault's home and arrested her. He confirmed that a printer was found in her home with prescription sheets, prescription bottles with the labels removed, and Rite Aid bottles. [N.T., 9-26-18, Vol. II, p. 125].

Sergeant Osman testified that he interviewed Defendant separately from Dr. Iyer and his wife. The first thing Defendant told the sergeant was that she had received a phone call from Rite Aid and told the pharmacist that the patient in question, Isabel Colon, was not one of Dr. Iyer's patients. She told Sergeant Osman that Ms. Colon was a relative of hers, and that she had no idea how she got a hold of the prescription. Sergeant Osman also testified that Dr. and Mrs. Iyer spoke very highly of Defendant and did not believe she could be involved. [N.T., 9-26-18, Vol. II, p. 127-28]. When he returned to the police station, Sergeant Osman received a message from Ms. Chenault's mother asking that he visit her in prison, which he did the following day. Sergeant Osman read Ms. Chenault her *Miranda* rights; he knew she was represented by counsel at that point. Ms. Chenault proceeded to talk to Sergeant Osman, and told him that she purchased the prescriptions in question from a girl she knew as "Chewy," who was a receptionist

5

at a doctor's office. The physical description given by Ms. Chenault matched Sergeant Osman's recollection of Defendant's appearance. Ms. Chenault proceeded to reveal places where she met Chewy and was also able to recite Chewy's phone number, which was the same number that Defendant gave Sergeant Osman as her own. [N.T., 9-26-18, Vol. II, pp. 129-133].

Sergeant Osman contacted Defendant and asked to question her again. She was given *Miranda* warnings and was interviewed at the police station. Defendant denied knowing Ms. Chenault and other names on the list that were tied to fraudulent prescriptions. She admitted to knowing two of the people, both of which were her relatives, and denied having any involvement in the fraudulent prescription scheme. Sergeant Osman asked if Defendant would mind looking through her iPhone, and said absolutely. Sergeant Osman did some quick searches and came across an email address with the name "Sharde" in it. Defendant said she had no idea where that email came from. In the text of the email was the word "Choo-choo," which the sergeant recognized as referring to "Chewy." Sergeant Osman also found a text message string with one of the people named in the fraudulent prescriptions. At this point in the interview, Defendant decided she did not wish to speak to the sergeant any longer; Sergeant Osman placed her under arrest and told her she was not free to go. [N.T., 9-26-18, Vol. II, pp. 134-139]. Defendant requested items from her car, and told the sergeant that she needed items from her purse. Sergeant Osman told her he was happy to retrieve those items, and Defendant told him she had a firearm in her purse. Sergeant Osman explained that the purse would be logged into evidence and he had to do an inventory search, as he could not leave the gun and purse sitting in the parking lot. There were many receipts and yellow adhesive notes in Defendant's wallet. Sergeant Osman obtained a search warrant for the purse and retrieved several items. At trial, Sergeant Osman explained the evidence from Defendant's wallet. [N.T., 9-26-18, Vol. II, pp.

6

140-41]. On the sticky notes there were five people listed, along with their dates of birth: Holly Heefner, Dwayne Carter, Tanya Lowery, Margaret Anderson, and Isabel Cohen. Sergeant Osman attested that these names and dates of birth matched a list of the fraudulent prescriptions issued. Additionally, the extraction report of Defendant's phone from the Attorney General's office revealed Defendant's past GPS locations, including a depiction of Ms. Chenault's home. There was also an email found that read, "getting my money from Sharde." [N.T., 9-26-18, Vol. II, pp. 141-46].

> In reviewing a sufficiency claim, we consider the entirety of the evidence introduced. *Commonwealth v. Watley,* 81 A.3d 108, 113 (Pa. Super. 2013) (*en banc* ). We view that evidence in a light most favorable to the Commonwealth, drawing all reasonable inferences in favor of the Commonwealth. *Id.* The evidence "need not preclude every possibility of innocence and the fact-finder is free to believe all, part, or none of the evidence presented." *Id.* Only where "the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances[,]" is a defendant entitled to relief. *Id.* We do not "re-weigh the evidence and substitute our judgment for that of the fact-finder." *Id.* As the question of the sufficiency of the evidence is one of law, we consider the evidence *de novo. Commonwealth v. Sanchez,* 614 Pa. 1, 36 A.3d 24, 37 (2011).

*Commonwealth v. Ford,* 141 A.3d 547, 552-53 (Pa. Super. 2016). With sufficiency of evidence issues, it is well-settled that the Commonwealth's burden may be sustained by means of wholly circumstantial evidence. *Commonwealth v. Markman,* 916 A.2d 586, 598 (Pa. 2007). Only when the evidence offered to support the verdict is in contradiction to the physical facts, or incontravention to human experience and the laws of nature, can the evidence be considered insufficient as a matter of law. *Commonwealth v. Widmer,* 560 Pa. 308, 744 A.2d 745 (2000).

A person commits the crime of unlawful acquisition of a controlled substance if he or she acquires or obtains possession of a controlled substance "by misrepresentation, fraud, forgery, deception or subterfuge." 35 P.S. § 780-113(a)(12). Defendant asserts that the evidence

7

presented at trial implicated Sharde Chenault and Krystal Lopez, but was not sufficient to convict Defendant of the crimes charged. We disagree. A totality of the evidence, viewed in the light most favorable to the Commonwealth, supports the jury's verdict that Defendant obtained possession of the oxycodone by means of fraudulent prescriptions given by Defendant to Ms. Chenault, and subsequently filled by Ms. Lopez.

Defendant was working for Dr. Iyer as his sole employee during the time the fraudulent prescriptions were being issued by his medical practice. The fraudulent prescriptions often included his DEA number, to which Defendant very likely had access during her employment, along with the doctor's prescription pads. There was evidence that Defendant paid Ms. Chenault for prescription papers for approximately $1,000 per prescription, and wrote out the names and quantity of oxycodone on such prescriptions, including at least one of Defendant's family members. While Defendant denied knowing Ms. Chenault, an email referring to her was found in Defendant's phone, and notes in Defendant's purse reflected the names and birthdates of those matched with fraudulent prescriptions for oxycodone. Moreover, an examination of Defendant's past GPS locations included Ms. Chenault's home. While there was also testimony presented that Defendant did not verify one of the fraudulent prescriptions in the course of her employment, along with evidence that Ms. Chenault and Ms. Lopez may have also been printing their own prescriptions, such evidence does not nullify the evidence of Defendant's involvement and conviction. The fact-finder was free to believe all, part, or none of the evidence presented, and, considering the foregoing, this is not a case where the evidence is too weak or inconclusive to support the outcome. To the contrary, the Commonwealth clearly proved the elements of unlawful acquisition of a controlled substance. *Ford, supra; Widmer, supra.*

8

For the same reasons, the evidence was clearly sufficient to support Defendant's conviction for conspiracy to commit unlawful acquisition of a controlled substance. With respect to the crime of criminal conspiracy, the Commonwealth must prove that the defendant (1) entered into an agreement to commit or aid in an unlawful act with another person or persons, (2) with a shared criminal intent and (3) an overt act was done by the appellant or one or more of the other co-conspirators in furtherance of the agreed upon crime. *Commonwealth v. McCall,* 911 A.2d 992 (Pa. Super. 2006). A conspiracy can be proven by the relation, conduct or circumstances surrounding the parties and the incidents involved. *Commonwealth v. Glover,* 582 A.2d 1111 (Pa. Super. 1990). It is not necessary to prove a formal agreement or contract; it can be proven by circumstantial evidence. *Commonwealth v. Roux,* 645 Pa. 482, 350 A.2d 867 (1976). *See Commonwealth v. Murphy,* 795 A.2d 1025 (Pa. Super. 2002) (the fact that evidence establishing a defendant's participation in a crime is circumstantial does not preclude a conviction where the evidence coupled with reasonable inferences drawn therefrom overcomes the presumption of innocence).

The trial testimony revealed that Defendant and her co-conspirator Ms. Chenault met through a mutual friend and they began communications via phone calls and texts for the purpose of obtaining fraudulent prescriptions for oxycodone. They met at Ms. Chenault's home and in the parking lot of Dr. Iyer's office, where Ms. Chenault would sometimes take prescription papers from Defendant's car, provided by Defendant, in exchange for payment. Items retrieved from Defendant's phone included an email indicating that she was "getting money from Sharde," along with evidence placing her a the location of Ms. Chenault's home. The circumstances surrounding the conduct of Defendant and Ms. Chenault undoubtedly support a finding that they agreed to commit fraud with a shared criminal intent, complete with the overt

9

acts of falsifying prescriptions for oxycodone and exchanging such prescriptions for money. *Johnson, supra; Glover, supra.* The circumstantial evidence, coupled with all reasonable inferences drawn therefrom, supports Defendant's conviction for conspiracy to commit acquisition of a controlled substance by fraud. *Murphy, supra.*

Defendant next asserts that this Court erred in denying her motion for a new trial based on a weight of the evidence claim. With respect to a weight of the evidence claim, the following standard of review has been set forth by our appellate courts:

> Our standard of review for a challenge to the weight of the evidence is well-settled: The finder of fact is the exclusive judge of the weight of the evidence as the fact finder is free to believe all, part, or none of the evidence presented and determines the credibility of the witnesses. *See Commonwealth v. Champney*, 574 Pa. 435, 444, 832 A.2d 403, 408 (2003), *cert. denied*, 542 U.S. 939, 124 S. Ct. 2906, 159 L. Ed. 2d 816 (2004). As an appellate court, we cannot substitute our judgment for that of the finder of fact. *See* id. Therefore, we will reverse a jury's verdict and grant a new trial only where the verdict is so contrary to the evidence as to shock one's sense of justice. *See Commonwealth v. Passmore*, 857 A.2d 697, 708 (Pa. Super. 2004), *appeal denied*, 582 Pa. 673, 868 A.2d 1199 (2005). Our appellate courts have repeatedly emphasized that "[o]ne of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence." *Commonwealth v. Forbes*, 867 A.2d 1268, 1273 (Pa. Super. 2005) (internal quotes omitted).

> Furthermore, where the trial court has ruled on the weight claim below, an appellate court's role is not to consider the underlying question of whether the verdict is against the weight of the evidence. Rather, appellate review is limited to whether the trial court palpably abused its discretion in ruling on the weight claim. *Champney*, 574 Pa. at 444, 832 A.2d at 408 (citation omitted).

*Commonwealth v. Rabold*, 920 A.2d 857, 860-861 (Pa. Super. 2007).

Defendant asserts that the only evidence implicating her in the crimes was the testimony of Ms. Chenault, who was expecting consideration from the Commonwealth based on her

10

cooperation. As set forth above, the record reflects that while Ms. Chenault was hoping for credit or consideration for her testimony, the prosecution made no promises or deals with her. Moreover, the jury clearly found Ms. Chenault's testimony credible and was free to believe all of it. Additionally, the record belies Defendant's claim that Ms. Chenault was the only witness to implicate her in the crimes charged. There is nothing about the verdict that is so contrary to the evidence as to shock one's sense of justice and, therefore, no error. *Rabold, supra.*

Finally, Defendant challenges her sentence as unreasonable and excessive. Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. *Commonwealth v. Raven,* 97 A.3d 1244, 1253 (Pa. Super. 2014).

> [A]n abuse of discretion is more than a mere error of judgment, thus, a sentencing court will not have abused its discretion unless the record discloses that the judgment exercised was manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will. In more expansive terms, ….An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous.
> The rationale behind such broad discretion and the concomitantly deferential standard of appellate review is that the sentencing court is in the best position to determine the proper penalty for a particular offense based upon an evaluation of the individual circumstances before it. Simply stated, the sentencing court sentences flesh-and-blood defendants and the nuances of sentencing decisions are difficult to gauge from the cold transcript used upon appellate review. Moreover, the sentencing court enjoys an institutional advantage to appellate review, bringing to its decisions an expertise, experience, and judgment that should not be lightly disturbed. Even with the advent of the sentencing guidelines, the power of sentencing is a function to be performed by the sentencing court. Thus, rather than cabin the exercise of a sentencing court's discretion, the guidelines merely inform the sentencing decision.

*Commonwealth v. Walls,* 592 Pa. 557, 564-70, 926 A.2d 957, 961-65 (2007) (internal quotation marks, footnotes, and citations omitted). A sentencing court need not undertake a lengthy discourse for its reasons for imposing a sentence. *Commonwealth v. Crump,* 995 A.2d 1280,

1283 (Pa. Super. 2010). Rather, the record as a whole must reflect the sentencing court's consideration of the facts of the case and the defendant's character. *Id.* It is presumed that where a pre-sentence report exists the sentencing court is aware of relevant information concerning the defendant's character, and considered that information along with mitigating statutory factors, when imposing its sentence. *Commonwealth v. Devers*, 519 Pa. 88, 546 A.2d 12 (1988); *see also Commonwealth v. Bonner*, 135 A.3d 592, 605 (Pa. Super. 2016) (A presentence investigation report constitutes the record and speaks for itself.).

Here, the Court had the benefit of a pre-sentence report and heard from various family members at the sentencing hearing. [Sentencing Hearing, December 5, 2018, Notes of Testimony, pp. 1-18]. The Commonwealth noted that the standard range guidelines were 60 to 78 months, and asked for an aggravated sentence based on all of the factors. The Court was made aware that Defendant had rejected an offer of ARD and pointed out that Defendant was the leader of a major criminal enterprise that put 15,000 pills on the street. [Sentencing Hearing, 12-5-2-18, N.T. pp. 23-26. This Court stated the following at sentencing:

> [O]ne would think that if one truly cared about the special needs of her daughter you wouldn't have gone in this direction. One would have thought that as she was finishing up to have a career professionally you wouldn't... Now I understand she had a very traumatic experience in her life, much greater than most folks have, granted. But she also has the wonderful love and support of her family. And so many other folks who come before me don't have.
>
> She had so many things going for her and then she came into not just a spontaneous criminal act, one that was a scheme that put thousands of pills out on the street that create violent and dangerous and destructive aspects throughout our society. She was one that was activating and allowing that to happen. The loss of trust from the doctor and what she put at risk for he and his wife has to be considered here as well.
>
> I'm shocked at the offer that was made earlier....If I knew it I had forgotten because of the activity of the number of folks that were involved in this process and the way that she used her position to continue to effectuate the scheme...

12

going on for a lengthy period of time. So although there is a jab of, gee, you consolidated them to increase the OGS. Well, that's because that's what it was. Let's be honest about it. That's what it was. This was not some isolated incident that occurred one or two times.

[Sentencing Hearing, 12-5-18, N.T. pp. 23-24]. The record as a whole reflects the Court's consideration in imposing a sentence of 5 ½ to 15 years of imprisonment. There has been no abuse of discretion, as there is nothing of record that such sentence is manifestly unreasonable, or the result of prejudice or ill will. This Court considered the pre-sentence report and made clear in its remarks that it was aware of all aspects of Defendant's background and gravity of the offenses. There is no merit to Defendant's sentencing challenge.

BY THE COURT:

Scott Arthur Evans, Judge

DATED: March 21, 2019

Distribution: 3/22/19 @ 238pm
Ryan P. Shovlin, Esq., District Attorney's Office
Damian J. DeStefano, Esq., 3800 Market St., Ste. 205, Camp Hill, PA 17011
Prothonotary, Superior Court of Pennsylvania
Chambers of Judge Scott Arthur Evans

13