J-A10024-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA  :   IN THE SUPERIOR COURT OF
  :       PENNSYLVANIA
  :
       v.   :
  :
  :
JANAE MARIE VELEZ   :
  :
      Appellant   :   No. 815 EDA 2024

Appeal from the Judgment of Sentence Entered October 20, 2023
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0005880-2021

BEFORE:    PANELLA, P.J.E., BECK, J., and FORD ELLIOTT, P.J.E.[*]

MEMORANDUM BY BECK, J.:                **FILED JUNE 26, 2025**

Janae Marie Velez ("Velez") appeals from the judgment of sentence entered by the Philadelphia County Court of Common Pleas ("trial court") following her conviction of aggravated assault and possession of an instrument of a crime. Velez claims that the trial court erred in excluding certain evidence and that the verdict was against the weight of the evidence. We affirm.

The relevant facts and procedural history are as follows. Just before 5:00 a.m. on October 2, 2020, City of Philadelphia police officers responded to a report of a person with a gun at a Philadelphia residence. N.T., 4/27/2023, at 98. Upon arrival, officers found Velez, Appolonia Rush ("Rush"), and Tiara Speights ("Speights") inside on the first floor of the residence. *Id.* Speights was laying on the ground with gunshot wounds to

_____

[*] Retired Senior Judge assigned to the Superior Court.

both of her legs. 4/27/2023, at 98; N.T., 4/26/2023, at 92. Velez admitted to shooting Speights three times. N.T., 4/28/2023, at 88-90; N.T, 4/26/2023, at 90-91. Police recovered two 9-millimeter and one .45 caliber fired cartridge casings at the scene, and a 9-millimeter handgun and .45 caliber gun from Velez's person. N.T., 4/27/2023, at 128, 144, 159-62.

Police arrested Velez and charged her with aggravated assault, possession of an instrument of a crime, simple assault, and recklessly endangering another person.[1] Velez claimed self-defense. Before trial, the Commonwealth sought to preclude Velez from introducing evidence of (1) a social media post from Speights' Facebook page picturing her carrying a firearm on a hip holster with the caption, "I grab my Beretta. It's been through a lot, but it shoots like new," followed by what the prosecutor described as a "[f]ire emoji, muscle arm emoji, raygun emoji, and … some kind of devil emoji"; and (2) an unrelated incident in May 2019 where Speights fired "warning shots" from her Beretta gun in public but was acquitted of criminal charges. 4/26/2023, at 5-7; N.T., 4/25/2023, at 7-12.

Velez sought to admit the Facebook post evidence to show that she feared Speight would shoot her because of Speights' "public persona" as someone who was always armed. N.T., 4/26/2023, at 8-11. She sought to admit evidence of her conversation with Speights about the May 2019 incident to show Speights' propensity for violence and that Velez's knowledge of the

_____

[1] 18 Pa.C.S. §§ 2702(a)(1), 907(a), 2701(a), 2705.

May 2019 incident contributed to her fear of being shot by Speights, particularly because Speights had told her that she shot at Rush's family members. *See* N.T., 4/25/2025, at 14-17. The trial court granted the motion in limine in part and denied it in part, precluding the Facebook post but ultimately ruling that Velez could introduce some evidence relating to Speights' May 2019 incident.[2] N.T., 4/26/2023, at 10, 12-13.

During the six-day trial, the Commonwealth presented the testimony of Speights, Rush, and three police officers who responded to the incident, along with numerous exhibits. The evidence presented by the Commonwealth was that in early 2020, Speights started an affair with Velez while Speights was in a romantic relationship with Rush, with whom she had been in a serious

_____

[2] As discussed more fully infra, Velez testified in her own defense at trial. During her testimony, the Commonwealth objected to her testifying to the substance of what Speights told her about the May 2019 incident. *See* N.T., 4/28/2023, at 37-39. After hearing argument from the parties outside the presence of the jury, the trial court sustained the objection in part, ruling that Velez could testify that she and Speights discussed the May 2019 incident and its effect on Velez, but not the specifics of what Speights told her about the incident. *See id.* at 40-48. Velez then testified that after conversations with Speights and Rush about the May 2019 incident, Speights had a cavalier attitude about the incident and bragged about the return of her guns, leading Velez to believe that Speights did not care about using a gun and would use one against someone she knew or to whom she was close. *Id.* at 49-55. Defense counsel later proffered that Velez would have testified that Speights told her the May 2019 incident involved a dispute with Rush's cousins, she shot at the cousins during the dispute, and she bragged about "beating" the system after her charges were dismissed and her gun was returned to her. N.T., 4/28/2023, at 158.

- 3 -

relationship since 2018.[3] N.T., 4/27/2023, at 8, 55, 10; N.T., 4/26/2023, at 54-56, 58, 101-02. Rush did not know about the infidelity. N.T., 4/26/2023, at 58. In the spring of 2020, Velez ended contact with Speights because of Speights' relationship with Rush. *Id.* at 102-03, 106. Speights continued to try to contact Velez on numerous occasions, both online and in person at Velez's home, but Velez blocked or rebuffed her attempts. *Id.* at 103-05.

In September 2020, Speights used a friend to contact Velez on her behalf. *Id.* at 106. Speights lied, telling Velez she was single even though she was still in a relationship with Rush; Speights and Velez resumed their relationship. *Id.* at 107. Shortly after, Rush learned about the infidelity when Rush answered Velez's call to Speights' phone. N.T., 4/27/2023, at 14-16, 63; N.T., 4/26/2023, at 58-60, 108-09. Throughout that day and the next, Rush and Velez continued to communicate with each other and went, unannounced, to Speights' home to confront her. N.T., 4/27/2023, at 16-18, 23-24; N.T., 4/26/2023, at 61-63, 110-11. The three women argued about their relationships; Velez and Rush left together but went their separate ways. N.T., 4/27/2023, at 18-20.

The following day, Speights was "hanging out" and drinking alcohol with friends when late at night, she called Velez to talk and asked to see her; unbeknownst to Speights, Velez added Rush to the call so she could hear their conversation. N.T., 4/27/2023, at 21-22, 67. Ultimately, Velez said Speights

_____

[3] At trial, Speights and Rush had been engaged since 2021. *See* N.T., 4/27/2023, at 8, 51; N.T., 4/26/2023, at 54, 99.

could come over to her place; Rush wanted to be there when Speights arrived, so she took an Uber to Velez's home. N.T., 4/27/2023, at 21-23, 27; N.T., 4/26/2023, at 65, 119-20, 122.

Speights arrived at approximately midnight, and Velez drove her to a nearby store for cigarettes; Rush arrived soon after they returned. N.T., 4/27/2023, at 27; N.T., 4/26/2023, at 67-68, 121, 123-24. Outside the home, Rush physically attacked Speights; during the altercation, Velez grabbed the firearm that was holstered on Speights' hip.[4] N.T., 4/27/2023, at 28; N.T., 4/26/2023, at 69, 125. The altercation did not last long because Rush started to have heart palpitations because of a heart condition; Velez returned Speights' gun to her. N.T., 4/27/2023, at 9, 29; N.T., 4/26/2023, at 70-72, 126. Eventually, the situation calmed down and Velez let both inside her home after Speights asked to use the bathroom. N.T., 4/27/2023, at 31-32; N.T., 4/26/2023, at 72, 128.

When Speights exited the bathroom, she overheard Velez telling Rush that Velez and Speights watched one of Rush's favorite television shows together. N.T., 4/27/2023, at 32-34; N.T., 4/26/2023, at 73-74, 128. This enraged Rush, who hit Speights in the head with a glass vase, causing cuts on her forehead and hand. N.T., 4/27/2023, at 32-34; N.T., 4/26/2023, at 74-75, 129-30.

---

[4] Speights testified that she owns several guns, is licensed to carry, and always carries a Springfield SD .45 caliber firearm holstered to her right hip and keeps a 9-millimeter APX Beretta handgun under the seat of her car or on her left hip. N.T., 4/26/2023, at 71-72, 111, 113, 127.

As the argument continued, Velez handed Rush a taser, which Rush used on Speights' chest, neck, and arm.  N.T., 4/27/2023, at 36-37; N.T., 4/26/2023, at 75, 77, 131.  Speights responded by pushing Rush, who tripped and fell; she again started to have chest pain and heart palpitations.  N.T., 4/27/2023, at 36-37; N.T., 4/26/2023, at 78, 133-34.  Speights quickly helped Rush up and apologized to her.  N.T., 4/27/2023, at 37; N.T., 4/26/2023, 78, 133-34.  Velez then pointed her own gun[5] at Speights, screaming that she was a hypocrite for saying she loved Rush just after she had pushed her to the floor.  N.T., 4/26/2023, at 79-80, 82.  Speights walked toward Velez, telling her "to mind [her] own fucking business" and "something about alpha and omega" and how Velez was "thinking that [she was] the man now."  N.T., 4/27/2023, at 69; N.T., 4/26/2023, at 82, 137, 169-70.  In response, Velez shot Speights in her left thigh and she fell to the floor.  N.T., 4/26/2023, at 82, 84, 139.  Velez approached Speights, screaming "I told you not to fuck with me." N.T., 4/27/2023, at 41-42.  With Speights on the ground and screaming in pain, Velez walked toward Speights and fired a second shot, hitting her lower left leg.  N.T., 4/26/2023, at 84-85.  Velez then pointed her gun at Speights' head and accused Speights of reaching for her own gun (which Speights denied doing at trial).  *Id.* at 86-87, 140-41.  Next, Velez removed Speights' gun from Speights' hip holster, said she was "going to shoot [Speights] with [Speights'] own gun for good measure," and shot her a

_____

[5] The parties stipulated that Velez legally owned her gun.  N.T., 4/27/2023, at 174.

third time in her right knee.  N.T., 4/27/2023, at 42-44; N.T., 4/26/2023, at 87, 89, 161.  Rush saw Speights reach toward her leg as she lay on the ground, which she thought was to apply pressure to the wound or feel where she had been shot, but not to reach for her own gun.  N.T., 4/27/2023, at 43.

As Rush pleaded with Velez to stop and tried to calm her down, Velez walked closer to Speights, pointed the gun at Speights' head, and said "You think I give a fuck about you? I beat up my own grandmother."  N.T., 4/27/2023, at 46-47; N.T., 4/26/2023, at 89.  Giving way to Rush's plea, Velez called 911, stated "I just shot a bitch," gave her address, dropped the phone, sat on the couch, and smoked a cigarette; Rush picked up the phone to handle the call.  N.T., 4/27/2023, at 47-48; N.T., 4/26/2023, at 90, 141-43.  At the direction of the 911 dispatcher, Rush asked for towels to help control Speights' bleeding and Velez responded that she did not want the "bitch" to "mess[] up [her] towels."  N.T., 4/27/2023, at 48.  When police arrived, before they entered, Velez again pointed a gun at Speights, saying "You better not snitch, bitch," and directed her and Rush to lie to police by saying they had been "playing around."  N.T., 4/27/2023, at 49; N.T., 4/26/2023, at 90, 142-44, 172.  Police disarmed Velez and took her into custody.  N.T., 4/27/2023, at 71; N.T., 4/26/2023, at 148.  At the hospital, detectives took Speights' statement, where she admitted she had been drinking "a lot" that night, said they were "playing around," and that she had charged at Velez in anger because Velez had come to Rush's defense.  N.T., 4/26/2023, at 91, 149, 151-52.

Velez painted a very different picture of what occurred that night, claiming that she acted in self-defense. In addition to her own testimony, she presented the testimony of her home health aide, a police officer who responded to Speights' May 2019 incident, and a character witness, along with numerous exhibits.

Velez's testimony generally confirmed the nature of her relationship with Speights, their background, and the sequence of events leading up to when she fired the first shot, although her testimony differed in some respects.[6] *See* N.T., 4/28/2023, at 23-25, 31-35, 55-58, 74-75, 77-78, 80, 82, 85-88. Velez disputed the circumstances surrounding the shooting, testifying that she fired the first shot because Speights was charging at her and she believed Speights was going to shoot her; she fired the second shot seconds later because Speights had wrapped her hand around her gun on her right hip holster and Velez believed Speights was going to shoot her; and she fired the third shot seconds after she struggled with Speights to disarm her because Speights started to reach for her other side and Velez believed Speights was reaching for a second gun to shoot her. *Id.* at 85-98, 121-24. She denied pointing a gun at Speights' head or that Rush pled with her to stop. *Id.* at 95. She further disputed Speights' and Rush's accounts of her role during the

_____

[6] For example, Velez testified that on the night of the shooting, the three women went inside her home for two reasons: to use the bathroom and because a man approached outside, telling them to take their argument elsewhere as they were attracting unwanted police attention. *Id.* at 67-68. In addition, Velez denied owning the taser Rush used or handing it to her, and testified that Rush retrieved it from Rush's purse. *Id.* at 72.

911 call. Velez testified and played for the jury a recording of the call, during which she was on the line until police arrived, admitted that she was the shooter, and never uttered the phrase that she "just shot a bitch." *Id.* at 91-94, Ex. D-13. She testified that she followed the 911 dispatcher's directions to open her front doors wide to facilitate access by police and paramedics,[7] and denied that she refused to render aid or provide towels, testifying that she and Rush used a couch cover to stem the bleeding. *Id.* at 93-94. She further denied threatening Speights and Rush if they talked to police. *Id.* at 95.

In support of her self-defense claim, Velez testified that Speights had previously threatened her with a gun, including the night before the shooting. *Id.* at 57-60. She also testified that she had observed three guns at Speights' house—one shotgun and two handguns—and that Speights always kept two handguns with her. *Id.* at 36-37, 130. In addition, Velez testified that she observed Speights with two guns on her person when they were in Velez's car together on the night of the shooting, one on each hip. *Id.* at 109. Velez stated that Speights put the guns in between the seats of the car, went into the store for cigarettes, and then put the guns back on her hips when she returned to the car. *Id.* at 109-10. Further, Velez added that she knew Speights had been charged previously in connection with the May 2019 incident, did not seem to take it seriously, and was willing to use a gun against

_____

[7] The first responding officer to arrive on scene testified at trial that the front doors were open when he arrived. N.T., 4/27/2023, at 114.

someone close to her. *Id.* at 49-53; *see supra*, note 2. Additionally, Velez testified that she is a domestic abuse survivor from her prior marriage in a different state, spent time living in several out-of-state domestic violence shelters, obtained a special protective driver's license to shield her residential address, and for her safety, relocated to Philadelphia and obtained housing with the assistance of one of the domestic violence shelters. N.T., 4/28/2023, at 26-31.

Three additional defense witnesses testified. First, Officer Rebecca Burns testified that she responded to Speights' May 2019 incident. N.T., 4/28/2023, at 9-21. She spoke to Speights, who matched the description of the person who had fired shots, at the scene; Speights was in her car and armed. *Id.* at 11-13. Police disarmed and arrested her. *Id.* at 13, 16. Officer Burns believed the female witnesses were Speights' family members but did not speak to any of them at the scene; they later refused to cooperate with police. *Id.* at 14-15. She did not know the outcome of the case. *Id.* at 16-17. Second, Velez's home health aide, Latoya Marlyn, testified that two days before the incident, she overheard an unidentified female voice threaten Velez during a phone call, stating "if you go to my girlfriend's house or meet up with her, I'm going to shoot you." N.T., 4/27/2023, at 94. Lastly, Velez's friend, Jacqueline Cassese, testified to Velez's reputation in the community for being honest, law-abiding, and peaceful. N.T., 4/28/2023, at 132-38.

On May 2, 2023, the jury convicted Velez of the above-stated crimes.[8] The record reflects that the jury convicted Velez based solely on Velez firing the third shot at Speights with Speights' own gun, as revealed by the jury's question: "When it comes to the shooting, we think the first gun, there was no intent. The second gun, we feel the intent was there. Can we separate the two of them?" *See* N.T., 5/1/2023, at 97.

The trial court sentenced her to an aggregate term of two to four years of incarceration followed by five years of probation. Her timely filed post-sentence motion was denied by operation of law. This timely appeal followed. Velez and the trial court both complied with the mandates of Rule 1925 of the Pennsylvania Rules of Appellate Procedure.

Velez raises the following issues for our review:

1. In a self-defense case, did the trial court err in excluding a Facebook post in which [Speights], less than a month prior to the incident, flaunted her past use of her gun and willingness to use it in the future?

2. In a self-defense case, did the trial court err in precluding [Velez] from testifying to the contents of a conversation in which [Speights] bragged to her about firing a gun at her girlfriend's family members during a fight, "beating" the resulting criminal charges, and getting her gun back?

3. Did the trial court abuse its discretion in denying [Velez's] motion for a new trial, where the jury's verdict was against the weight of the evidence?

---

[8] The Commonwealth nolle prossed charges of simple assault and recklessly endangering another person.

Velez's Brief at 2-3.

### Evidentiary Rulings

Velez's first two issues challenge the trial court's evidentiary rulings. Our standard of review for evidentiary issues is an abuse of discretion. **Commonwealth v. Grubbs**, 330 A.3d 444, 449, 454 (Pa. Super. 2025). "An abuse of discretion is the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will, or partiality, as shown by the evidence of record." **Id.** at 449 (citation and quotation marks omitted).

"All relevant evidence is admissible, except as otherwise provided by law. Evidence that is not relevant is not admissible." Pa.R.E. 402. Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." Pa.R.E. 401.

A trial court "may exclude relevant evidence if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Pa.R.E. 403. "'Unfair prejudice' means a tendency to suggest decision on an improper basis or to divert the jury's attention away from its duty of weighing the evidence impartially." Pa.R.E. 403 cmt.; **see also Commonwealth v. Santiago-Burgos**, 314 A.3d 535, 544 (Pa. Super. 2024).

Generally, character or character trait evidence is inadmissible "to prove that on a particular occasion the person acted in accordance with the character or trait." Pa.R.E. 404(a)(1). However, in criminal cases, "a defendant may offer evidence of an alleged victim's pertinent trait" and "may prove the character or character trait by specific instances of conduct." Pa.R.E. 404(a)(2)(B), 405(b)(2), 405 cmt. (citing **Commonwealth v. Dillon**, 598 A.2d 963, 964 (Pa. 1991) (stating that where self-defense is claimed, a defendant may introduce evidence of a victim's violent character)).

Velez argues that the trial court erred by excluding two pieces of evidence: Speights' social media post and Velez's testimony regarding details of a conversation she had with Speights about the May 2019 incident. Velez's Brief at 21. She contends that these pieces of evidence were relevant to her claim of self-defense to show why she was worried Speights might shoot her and worried she had a second gun.[9] **Id.** at 19, 21. Velez argues that under

_____

[9] As our Supreme Court has explained, in self-defense cases, "[t]he use of force against a person is justified when the actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by the other person." **Commonwealth v. Torres**, 766 A.2d 342, 345 (Pa. 2001) (citing 18 Pa.C.S. § 505). When a defendant claims self-defense and there is at least some evidence to justify such a finding, the Commonwealth has the burden to disprove the defense beyond a reasonable doubt. **Id.** (citations omitted). To sustain this burden, the Commonwealth must prove any of the following: "1) the accused did not reasonably believe that he was in danger of death or serious bodily injury; or 2) the accused provoked or continued the use of force; or 3) the accused had a duty to retreat and the retreat was possible with complete safety." **Commonwealth v. McClendon**, 874 A.2d 1223, 1230 (Pa. Super. 2005). The factfinder
*(Footnote Continued Next Page)*

Pennsylvania law, her knowledge of Speights' "general tempestuous character" and "possession of, past use of, and attitude towards firearms" should have been admitted because it was essential for the jury's understanding of the reasonableness of Velez's actions in her own defense. *Id.* at 22. Specifically, Velez contends the evidence would have helped to explain to the jury why she believed she had to fire the third shot: she knew Speights always had her Beretta gun on her (which was not the gun Velez disarmed from Speights), was willing to use it, and was confident she could "get away" with doing so. *Id.* at 22-23. According to Velez, the trial court's erroneous rulings resulted in her inability to properly show the jury why she was afraid that Speights was reaching for a second gun when she fired the third shot. *Id.* at 23.

### Social Media Evidence

Velez argues that the Facebook post was relevant to show Speights' "public persona" as someone who was always armed and Velez's fear that Speights would shoot her. Velez's Brief at 24-26. Velez further argues that the claimed prejudice of presenting this evidence to the jury—that Speights "promoted her own reputation as a dangerous person who cherished her handguns and was unafraid to use them"—is precisely the impact the photo

_____

determines whether "the accused's belief was reasonable, whether he was free of provocation, and whether he had no duty to retreat." *Id.*

had on Velez and thus, the evidence was "overwhelmingly relevant" to her self-defense claim. *Id.* at 27-28.

In its opinion, the trial court explained the social media post's exclusion as follows:

> In this case, while the photo and caption may have some relevance on Velez's state of mind during the shooting, their admission could unduly influence the jury's emotions, leading to a decision based on an improper basis, such as bias or hostility towards [Speights]. The prejudicial effect may arise from the jury's reaction to the content of the photo or the nature of the caption, which would distract from the central issues of the case and impede a fair and impartial verdict. The [trial c]ourt explicitly did not rule out revisiting the matter if a witness or the Commonwealth "opened the door," regarding the photo and caption, but the issue was never raised again at trial.
>
> Moreover, Velez had alternative means to substantiate her self-defense claim. [Speights'] testimony provided independent support for the Velez's account. [Speights] confirmed her long-standing license to carry firearms since age 21, her habit of carrying two guns, and her ownership of three guns, including a shotgun. [N.T., 4/26/2023, at] 71[-]72, 111. She acknowledged she has created a public image as a gun owner. *Id.* [at] 113-114. She admitted possession of a Springfield .45 [gun] on the incident night. *Id.* [at] 86. She also recounted firing warning shots in a [May] 2019 incident, and the subsequent suspension and reinstatement of her carry license. *Id.* [at] 97-100. These admissions lent credence to [Speights'] familiarity and interaction with firearms.
>
> [Speights'] initial flippant response of "enough," when queried about the number of guns she owns, further echoed Velez's claim of [Speights'] nonchalant attitude towards gun ownership. *Id.* [at] 111. Testimony from Velez's health aide, Ms. Marlyn, indicated that she overheard a threat made to Velez, implied to be from [Speights], which was "if you go to my girlfriend's house or meet up with her, I'm going to shoot you," just days prior to the incident. *Id.* [at] 94. Furthermore, Rush's account suggested that [Speights] retained possession of her firearms following her arrest, contrary to [Speights'] claims. *Id.*

- 15 -

[at] 60. This testimony also paints a picture of someone who is "cavalier" about her possession and use of guns. Given the inherently prejudicial nature of the photo and caption, considering the broader evidentiary context and the need to maintain a fair trial, the [trial c]ourt's ruling was not erroneous.

Trial Court Opinion, 6/24/2024, at 3-4 (party designation altered).

We find no merit to Valez's claim. As both Velez and the Commonwealth readily observe, the jury's question during deliberations, described above, made it clear that it found Velez fired the first two shots in self-defense, and the outcome of trial turned on whether the jurors believed she also fired the third shot in self-defense. *See* N.T., 5/1/2023, at 97; *see also* Velez's Brief at 22-23 & n.7; Commonwealth's Brief at 19 n.3. Thus, to acquit her, the jury was required to find that Velez believed Speights was carrying two firearms on the night in questions. Therefore, based upon Valez's stated reason for admitting the Facebook post and caption, if there was any error in the exclusion of this evidence, it was harmless.

"An error will be deemed harmless where the appellate court concludes beyond a reasonable doubt that the error could not have contributed to the verdict." *Commonwealth v. Mitchell*, 839 A.2d 202, 214 (Pa. 2003). The Commonwealth bears the burden to establish that the error was harmless. *Id.* at 215. The Commonwealth satisfies this burden when it establishes any of the following:

(1) the error did not prejudice the defendant or the prejudice was de minimis; or (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly

admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error so insignificant by comparison that the error could not have contributed to the verdict.

***Commonwealth v. Passmore***, 857 A.2d 697, 711 (Pa. Super. 2004) (citations, quotation marks, and brackets omitted).

As Valez argued before the trial court and continues to argue on appeal, the Facebook post evidence was relevant to show Speights' cavalier attitude about using a firearm and that she publicly portrayed herself as someone who carried a gun. The evidence was not probative, however, of whether Velez acted in self-defense when she fired the third shot because it depicted Speights with only one gun; at the time Velez fired the third shot, she had already disarmed Speights of the gun on her right hip. Therefore, the Facebook photograph did not tend to make it more likely that Velez feared or reasonably believed that Speights had two guns on her person at the time of the shooting.

The jury's question demonstrated that Velez successfully established that she fired the first two shots in self-defense.[10] Accordingly, preclusion of

_____

[10] That evidence included: (1) Velez's testimony that Speights previously threatened her with a gun as recently as the night before the shooting; (2) Velez's testimony about the domestic violence she experienced by her ex-wife, the severity of which required her to relocate several times and obtain a special driver's license that concealed her address; (3) Speights' admission that her public persona was that of a gunowner, she always has two guns with her, and that she carries her Springfield .45 on her right hip and keeps her Beretta under the seat of her car or on her left hip; (4) Velez's knowledge that

*(Footnote Continued Next Page)*

- 17 -

the Facebook post evidence was harmless as it did not prejudice Velez. The basis for its admission argued by Valez was also largely cumulative of the other evidence that the jury heard about Speights' gun ownership and attitude about using guns. *See supra*, note 10. Therefore, even if the trial court erred by excluding the Facebook post, such error was harmless beyond a reasonable doubt. *See Mitchell*, 839 A.2d at 214; *Passmore*, 857 A.2d at 711.

### Evidence of May 2019 Incident

Second, Velez challenges the trial court's exclusion of Velez's testimony regarding the substance of the conversation she had with Speights about the May 2019 incident. *See* Velez's Brief at 28-33. She contends that had the trial court permitted it, she would have testified that "Speights bragged to her

---

Speights owned multiple guns and took them "[p]retty much everywhere she went"; (5) Velez's testimony that she saw Speights with two guns, one on each hip, in her car on the night of the shooting; (6) Rush's testimony that Speights walked toward Velez just before Velez shot her; (7) Speights' statement to police in the hospital that she charged at Velez in anger because Velez had come to Rush's defense; (8) the testimony of Speights, Rush, and a responding officer regarding the May 2019 incident where Speights fired "warning shots" from her Beretta gun in public; (9) Velez's testimony about Speights' cavalier attitude toward guns and bragging about the May 2019 incident, and Velez's belief that Speights did not take the incident seriously and would shoot someone close to her; (10) the testimony of Velez's home health aide about a threat to shoot Velez that she overheard during a phone call, with the implication that Speights made the threat; (11) the testimony of Velez's friend to her reputation in the community for being peaceful, law-abiding, and honest. N.T., 4/28/2023, at 10-21, 26-31, 36-37, 49-55, 58-60, 96-98, 109-110, 132-38; N.T., 4/27/2023, at 55-59, 69, 94; N.T., 4/26/2023, at 72, 113, 127, 152.

about shooting at her girlfriend's cousins, getting away with it, and getting the gun back." *Id.* at 29; *see also id.* at 28 (quoting N.T., 4/28/2023, at 158) (defense counsel's proffer)). According to Velez, she needed to testify to what Speights said to her "because that was the **only** way to articulate the most frightening part of the conversation—namely, that the people [Speights] was bragging about shooting at were not robbers or even strangers (as she claimed in her own testimony) but members of her girlfriend's family." *Id.* at 29-30 (emphasis in original). She reiterates that the testimony was not being offered for its truth but rather to show its effect on Velez. *Id.* at 31. She contends that the trial court erroneously excluded it based on hearsay and deprived her of a critical piece of her self-defense claim. *Id.* at 32-33.

The record reflects that at trial, several witnesses testified regarding the May 2019 incident. *See* N.T., 4/28/2023, at 10-21; N.T., 4/27/2023, at 55-59; N.T., 4/26/2023, at 96-98, 112, 114-119. The trial court summarized their testimony as follows:

> [Speights] testified that in May [] 2019, a "couple of guys," pulled her out of her car and tried to rob her. [N.T., 4/26/2023, at] 96-97. She testified that she did not know them. *Id.* [at] 114. [Speights] fired three warning shots. *Id.* [at] 97. Rush testified that she saw her cousin, who was a woman and lived on the block, speak to police when they arrived but that she was not the complaining witness on that case, and that her cousin never came to court on the issue. [N.T., 4/27/2023, at] 55-56, 58. Officer Burns, the officer who responded to that 2019 report of a woman with a gun, recalled the event and [Speights], but she did not speak to any complaining witnesses and was not called to testify at that trial. [N.T., 4/28/2023, at] 14-15. She had no knowledge of the outcome of the case. *Id.* [at] 16-17.

- 19 -

Trial Court Opinion, 6/24/2023, at 5. Further, as detailed above, the trial court permitted Velez to testify to her familiarity with the May 2019 incident and how Speights' failure to take the incident seriously formed Velez's belief that Speights would not hesitate to use a gun, including against those close to her. *See* N.T., 4/28/2023, at 49-55. This testimony directly supported Velez's theory that she feared Speights was going to shoot her in her own home during the incident.

In its opinion, the trial court explained its limitation of Velez's testimony:[11]

> Velez sought to testify as to a private conversation between her and [Speights] wherein [Speights] identified the other party in the 2019 shooting incident as Rush's cousin.
>
> * * *
>
> The [trial c]ourt acknowledges Velez's intention to use this testimony to help establish a self-defense claim. Velez claimed knowing that [Speights] shot at [Rush's] relatives is significantly scarier than the idea of [Speights] shooting at strangers in self-defense. That may or may not be true. However, the [trial] court must also consider the potential for such testimony to confuse the jury. The incident in question is not the subject of the litigation, and the details of that event could lead jurors away from the central issues of the current case. The risk is that the jury might improperly infer guilt or innocence based on the actions of [Speights] in an unrelated matter, that predates [Speights'] interactions with Velez, and which is not before them. The potential for jury confusion and the introduction of collateral issues substantially outweigh the probative value of the testimony regarding the 2019 shooting. The decision to suppress this

_____

[11] The trial court assumed arguendo that Velez sought to introduce Speights' statements for their effect on the listener and not for the truth of the matter asserted. Trial Court Opinion, 6/24/2024, at 4-5.

- 20 -

evidence was a proper exercise of judicial discretion to ensure a fair trial focused on the relevant facts at issue.

Trial Court Opinion, 6/24/2024, at 5-6 (party designation altered).

Once again, we find that, even if the trial court's exclusion of the identified portion of the conversation was error, it was unquestionably harmless. Like the Facebook-post evidence, the specifics of Velez's conversation with Speights about the May 2019 incident had no bearing on whether she believed Speights had two guns on her person at the time Velez fired the third shot, which, as stated above, was the only basis for her conviction. *See* N.T., 5/1/2023, at 97. Accordingly, Valez was not prejudiced by the exclusion of the complained-of evidence. *See Passmore*, 857 A.2d at 711.

## Weight of the Evidence

In her final issue, Velez contends that she is entitled to a new trial because the jury's verdict is contrary to the weight of the evidence. Velez's Brief at 33-40. She argues that the testimony of Speights and Rush were replete with contradictions or omissions from their prior statements and other audio and video evidence. *Id.* at 34, 37-38. She also asserts that the similarity between the two witnesses' contradictions shows they were orchestrated and fabricated. *Id.* at 34, 37. According to Velez, their attempts to paint her as "cold, heartless[,] and cruel" were unsupported by other neutral evidence. *Id.* at 35-37. For example, their testimony that Velez refused to call for help, told the 911 dispatcher that she "just shot a bitch,"

refused to provide towels to stem bleeding, and refused to open her front doors for police was refuted by the 911 call recording and police body worn camera footage. *Id.* In addition, she highlights Speights' own testimony, where she admitted that she lied to Rush and Velez about her infidelity and lied again when she held herself out as single in an effort to resume her relationship with Velez. *Id.* at 39. Velez contrasts this with what she describes as her own consistent testimony. *Id.* at 40. In short, Velez argues that the jury should have believed her, not Speights and Rush. *Id.*

The following legal principles apply to a trial court's consideration of a challenge to the weight of the evidence supporting a conviction:

> An allegation that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. A trial judge must do more than reassess the credibility of the witnesses and allege that he would not have assented to the verdict if he were a juror. Trial judges, in reviewing a claim that the verdict is against the weight of the evidence do not sit as the thirteenth juror. Rather, the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.

> Thus, to allow an appellant to prevail on a challenge to the weight of the evidence, the evidence must be so tenuous, vague and uncertain that the verdict shocks the conscience of the trial court.

*Commonwealth v. Juray*, 275 A.3d 1037, 1046-47 (Pa. Super. 2022) (quotation marks and citations omitted). The jury, sitting as factfinder at trial, "is free to believe all, part, or none of the evidence presented."

***Commonwealth v. Williams***, 302 A.3d 117, 120 (Pa. Super. 2023)

(quotation marks and citation omitted).

Our standard of review for weight of the evidence claims, however,

differs from that of the trial court:

> Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence.  Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence.  One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

***Id***. at 1047 (citation omitted).

> In rejecting Velez's weight claim, the trial court explained:

> Here, though the Facebook photo and caption and Velez's testimony as to [Speights'] statements to her regarding the prior [May 2019] shooting incident were properly excluded from evidence, and the jury heard testimony from Velez, [Speights], and Rush, as well as that of three officers who responded, … Velez's home health worker who testified to threats she heard made against Velez[, and] an officer who responded to [Speights'] 2019 shooting incident.  The jury, as the finder-of-fact, was free to resolve contradictions in the testimony of the parties and to decide issues of credibility.  Because the jury's verdict does not "shock one's sense of justice," the jury's verdict is not against the weight of the evidence and the [trial c]ourt did not abuse its discretion in denying Velez's motion for a new trial.

Trial Court Opinion, 6/24/2024, at 6 (party designation altered).

Based upon our review of the record, we discern no abuse of discretion

by the trial court in determining that the jury appropriately weighed the

- 23 -

evidence before it and that its verdict did not shock the conscience. **See Juray**, 275 A.3d at 1046-47; **see also Williams**, 302 A.3d at 120. The jury, as sole arbiter of credibility, did not credit Velez's claim of self-defense. **See Commonwealth v. Clemons**, 200 A.3d 441, 464 (Pa. 2019) ("The jury is the ultimate fact-finder and the sole arbiter of the credibility of each of the witnesses."). To the extent Velez requests that we reweigh the evidence, we may not do so.[12] **See Commonwealth v. Collins**, 70 A.3d 1245, 1251 (Pa. Super. 2013) (stating that "[a]n appellate court cannot substitute its judgment for that of the finder of fact") (citation omitted). Accordingly, Velez's weight-of-the-evidence claim fails.

## Conclusion

As we find no merit to Velez's evidentiary and weight of the evidence claims, she is not entitled to relief.

Judgment of sentence affirmed.

---

[12] Moreover, we note that Velez answered affirmatively when a police officer asked her at the scene if she shot Speights with Speights' own gun just to do it, and she failed to mention anything about a second gun on Speights' person in her statements to police on the date of the incident. **See** N.T., 4/28/2023, at 110-11, 124-26, Exs. C-8, C-28B (Police Officer Kyle Rocks' body-worn camera footage at 5:28-5:32), D-15.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: <u>6/26/2025</u>